Effie WYNN et vir, Appellants,

v.

Ruperto MENDOZA, Appellee.

No. 12935.

Court of Civil Appeals of Texas.

Galveston.

Feb. 2, 1956.

Rehearing Denied Feb. 23, 1956.

Geo. P. Murrin and J. M. Slator, III, Houston, for appellants.

Beckhusen & Lerner and Jack H. Beckhusen, Lamarque, for appellee.

GANNON, Justice.

Trespass to try title suit by Ruperto Mendoza, plaintiff, against Effie Wynn and husband, defendants, for possession of Block 44 of the townsite of Arcadia, Galveston County, Texas, a tract of land 300 feet square. Effie Wynn holds the record title. Ruperto Mendoza claims solely under the ten year statute of limitations, Art. 5510, V.A.T.S. A trial before the court without a jury resulted in judgment for Mendoza, and defendants Effie Wynn and husband appeal.

There are four formal points on appeal, but in substance they raise the one proposition that plaintiff's evidence failed to establish notorious, adverse, and hostile possession of the subject land, for a ten year period, of that quality and character required by the statute, to indicate unmistakably an assertion by plaintiff of a claim of right adverse to the true owner.

█ If there is some evidence to support each of the statutory requirements of adverse possession, the judgment of the trial court must stand. We, therefore, state the case in its most favorable light from plaintiff's standpoint omitting all proof which would only raise fact issues on the several essential elements of adverse possession.

Our statement will be much more readily understood by reference to the following survey of Block 44 of the townsite of Arcadia offered in evidence by plaintiff to show, "the boundaries of Block 44, the dedicated streets and any existing fences or improvements to Block 44 as of January 23, 1953." Certain letterings and markings on the plat of the survey made during the trial will be referred to.

G.C. & S.F. RY.    N.68°25'W.          To Galveston →

150'

Bll.

50'

Fence Cor. 110.° N.21°35'E.
and 7.2' N.68°25'W. from
most Northerly Cor. of
Blk. 44,          N.68°25'W.  983.2'          Garage

30' Strip shown as
Planting Area on Map    50'          Shed          Shed

BERITON          STREET
(80' Wide)

Cattle
Gap

S.24°14'W. 194.6'

FROST  STREET
(Not Open)

STREET
(80' Wide)

CARK  STREET
(80' Wide) (Not Open)

Hoffman

37          300'

420.1'          BLOCK 44          300'

S.20°04'W. 225.8'          300'

N.21°35'E. 418.4'

300'

S.68°40'E.
386.2'

FIFTH
(80 Wide)          STREET
Not Open

38          43

SURVEY
of BLOCK 44, of TOWNSITE of
ARCADIA
GALVESTON COUNTY.
TEXAS.
SHOWING LOCATION of FENCES ENCLOSING SAME.

Scale: 1"= 60'                    Jan. 25, 1953.

L. & H. ENGINEERS

By ~

It will be observed that Block 44 is a townsite block, entirely surrounded by four dedicated public streets each 80 feet in width with Beriton Street lying to the north. Immediately north of Beriton Street there is a 30 foot strip shown as "planting area." This is referred to in the proof as a public planting area. To the north of this 30 foot planting area is the G. C. & S. F. section house tract, and still farther north the railroad right of way proper. The section house grounds extend out south from the right of way 100 feet and are directly north across Beriton Street and the public planting area from Block 44. The two squares appearing on the plat of the survey on the section house area indicate the section houses themselves. The Hoffman tract lies across Cark Street to the east of Block 44 and extends north and south of it. Though the planting strip is treated by the parties as a public planting area, still it is neither a street nor an alley, Art. 5517, V.A.T.S., and we treat it as in common private ownership of some undisclosed character.

In 1927 plaintiff, Mendoza, immigrated from old Mexico and went to work as a section hand for the G. C. & S. F. Railroad Company. He and his family moved into a section house on the railroad property where they resided continuously from 1927 until 1954. Before and after 1936 John L. Belch resided on Block 37 immediately west of Block 44. At all material times prior to 1941 Mary L. Oliver was the record owner. She conveyed to Effie Wynn in that year.

The evidence reveals that for some years prior to 1936 John L. Belch was using Block 44 to graze one or more milch cows. This use was in recognition of the title of Mary L. Oliver. Belch had enclosed Block 44 along with a portion of Beriton and Cark Streets, by constructing west and south fences, and tying these on to the railroad right of way and Hoffman's fences on the north and east, respectively. At some period between 1936 and 1939 John L. Belch ceased to use the property. At some time during this period plaintiff took over. At the time plaintiff owned a milch cow and some chickens as he had since 1933–34, when he built the sheds shown on the plat of the survey to lie right on the 30 foot planting area to house his cow and chickens. At about the same time he built a garage on the section house land as shown on the survey.

Plaintiff's witness, Harvey Belch, first testified that his father quit using Block 44 in about 1935, but on having his recollection refreshed by being shown an acknowledgment of tenancy in favor of Mary L. Oliver signed May 28, 1938, reciting that John L. Belch was then in possession of and using Block 44, this witness testified as follows:

"Mr. Belch, you have just heard this instrument read which I have had identified by the Court Reporter, and you will note that it states in there Mr. Belch, your father, stated in there that on this date he was 'now in actual possession of and using Blocks 43 and 44' and that he had been using it for some years. Having had that to refresh your memory, don't you feel that you may be somewhat in error in stating that he hadn't used it after six years from 1925? A. Well, I could be.

"Q. As a matter of fact, he had a milk cow that he kept over there a good part of the time, didn't he? A. Yes.

"Q. As a matter of fact, he kept it over there up until some time later around 1939 or 1940 and then moved it back behind his house, isn't that correct? A. Yes.

"Q. And so he was actually keeping this milk cow over there until some four or five years after Mendoza started keeping his milk cow there, isn't that true? A. It could be.

"Court: Well, is it or is it not, Mr. Belch? A. Yes, sir.

"Mr. Slator: And it is also true, isn't it, Mr. Belch that really your father and Mendoza here after he started and other people just used that land there as being somebody else's land to keep their milk cows on? That was really what they were doing, wasn't it? A. Yes, sir.

"Q. I will ask you if you know isn't it a pretty common practice with people in a small town when they have a milk cow or

keep a milk cow for their milk to find a vacant piece of land and put a fence around it to keep their cow on it? A. Yes.

"Q. So far as you could tell, when Mr. Mendoza started keeping that milk cow of his on that land that was just about what he was doing, wasn't it? A. Yes, sir."

Plaintiff's testimony is that in "about" 1936 John L. Belch no longer owned a cow; that the existing south and west fences were in bad state of disrepair, and that he, plaintiff, rebuilt and repaired these particular fences so that they would turn cattle. He describes Belch's west fence line as extending across Beriton Street and up to the railroad right of way fence, so that the enclosure would be from point A through B, C, and D and back to point A as shown on the plat of the survey, so as to include the 30 foot planting strip lying north of Block 44, and as well so much of Beriton and Cark Streets as lie north and east of Block 44. This, of course, enclosed the land on which plaintiff had built his sheds, and all in all during Belch's time disclosed a most friendly and neighborly state of affairs not unusual in small community life. Plaintiff does not claim that prior to 1953 he ever built, rebuilt, or repaired any fence along the north line of Block 44. His testimony is that when Belch left and, he, Mendoza, took over alone, he merely repaired and rebuilt Belch's west and south fences and tied them on respectively to the railroad right of way fence on the north and to Hoffman's fence on the east. Plaintiff does not claim to have built or maintained either of these last two fences. As to the west and south fences he testified as follows:

"Q. Did you construct the other two fences? A. I fixed them up every year. I put them up, and I fixed them up every year."

At first—1936 according to plaintiff—he just put some wires together for a gate or entrance into the enclosure, but a few years later and well within ten years from 1936 he built a gate and installed a cattle guard on the west line of the enclosure. This cattle guard we infer from the plat of the survey to be the "Cattle gap" shown to be right

in the middle of Beriton Street. Such a cattle guard would permit public use of the street, though plaintiff testified that it was installed for his own convenience for getting his trucks into the enclosure. Plaintiff's survey shows that the only two fences which he ever built, or rebuilt, or repaired were with the exception of 30 feet of the planting area entirely in the public ways. Neither lies on any part of Block 44 proper, nor does any part of the railroad right of way or Hoffman's fences to which he tied on.

Plaintiff describes the situation before and after John L. Belch left as follows:

"Q. Did you place any buildings inside the fences? A. What?

"Q. Any kind of building. A. I made a barn and a place for the chickens.

"Q. When did you make the barn and the place for the chickens, in what year? A. First, in about 1933 or 1934, I built a garage. I built a place for the cows and a place to put the chickens in.

"Q. In 1933 or 1934? A. About that time.

"Q. Did you ever hear of a fellow by the name of John Belch? A. Yes, sir.

"Q. Did Mr. Belch ever use the land after you began using it? A. Mr. Belch had two cows there, and after he left it I took it over. That was about 1936.

"Q. Mr. Belch had two cows? A. Had two cows in there, and when he left I took up the lot about 1936.

"Q. Were the fences there when Mr. Belch left? A. Oh, just a few posts. The fences were falling down, because he didn't have no more cows.

"Q. A few posts were there? A. Yes."

During the period 1936–1953 plaintiff did maintain the south and west fences in good shape to turn cows at all times except when the cows would tear the fences down. But when this happened plaintiff would quickly repair them. Presumably the railroad fence on the north and the Hoffman fence on the

east were likewise so maintained during the period 1936–53, but plaintiff does not testify or claim to have had any part in such maintenance. Actually the record is silent on this point, and the proper maintenance of the railroad and Hoffman fences is inferably only from plaintiff's testimony that during the stated years the enclosure did turn cattle. Plaintiff never constructed any improvements whatsoever on any part of the enclosure after 1933–34 and never at any time on any part of Block 44. However, plaintiff did continuously and exclusively use the enclosure during the period 1936–53 to graze his milch cow or cows. At times he would have as many as four. Plaintiff never cultivated the land before 1954, but he did cut out the senna bean growth annually to make for better grazing. Plaintiff's use of the land was limited entirely to grazing for milch cows. While on the stand plaintiff was not asked if he entered upon the land under claim of right, or if he at any time overtly asserted such a claim, nor did he volunteer such a statement. He testified as follows:

"Q. Do you have a deed to this property? A. No, sir.

"Q. Why do you say that this land is yours? A. Because I fenced it, I cleaned it, and I worked it."

The work referred to is the annual spring senna bean bush cutting to make for somewhat better grazing. There is opinion testimony from residents of the area that they "judged" or "considered" the land in the enclosure to be plaintiff's land. But these conclusions add nothing to plaintiff's visible acts on the land. Also there is the testimony of plaintiff's son as follows:

"Q. Have you ever heard anyone question, until this suit was brought, your father's claim of ownership in this property? A. There hasn't been nobody around there to inquire on that property. It was my daddy's, and that was the way I learned that it was his when I was a kid, and I didn't know any different.

"Q. You, as his son here—you don't live on the place? A. No.

"Q. But you, as a child, you assumed that it was his? A. I assumed it was his as a child, yes, sir.

"Q. You have never known any different? A. Until this suit was brought up."

The "Claim of ownership" inquired about appears nowhere in the record except in the quoted question. When, where, and if such a claim was ever asserted is not proved. The son's assumption of his father's ownership adds no strength to the facts upon which it is based.

Plaintiff has never rendered the land for taxation nor paid any taxes on it.

In 1953 plaintiff was told by his foreman that the county authorities wanted to grade and shell Beriton Street where it ran through plaintiff's enclosure, and that plaintiff would have to remove his fence across Beriton Street. This plaintiff promptly did—he says after consulting his lawyer. Plaintiff then constructed a new fence along the north line of Block 44 from its northwest corner to the Hoffman fence—E to F on the plat of the survey, and the county went ahead with its grading and shelling of Beriton Street.

In 1954 plaintiff ceased to occupy quarters in the section house and moved into a home of his own—just where is not shown. Questioned about the present status of the sheds he had built on the 30 foot planting area, plaintiff testified:

"Q. This barn and chicken house that you built within the fenced enclosure, how long did that stay there? A. When I moved from there the section foreman knocked them down.

"Q. Approximately how long ago was that? A. About the year that I knocked the chicken house down.

"Q. About a year ago? A. Yes.

"Q. Was that before or after the County put the road there? A. The County had already put the road there."

The applicable law under the ten year statute is well settled, and it would be

pointless to cite authority on the proposition that the statute requires not only use and occupancy, but that such use and occupancy, in addition to being exclusive and continuous, must also be begun and continued for the statutory period under a claim of right notoriously asserted and hostile and adverse to the true owner.

■ Grazing of cattle within an enclosure may constitute a sufficient use and occupancy to meet those demands of the statute. But where only such character of use and occupancy is shown there remains always the question of the adverse and hostile quality of the use and occupancy. That is to say, whether such use and occupancy was begun and continued for the statutory period under claim of right adverse and hostile to the claims and rights of the true owner.

■ Under certain circumstances the enclosing of the land and its use for grazing alone is taken as sufficient evidence of adverse claim of right. But circumstances alter cases. 1 Am.Jur., Title Adverse Possession, Sec. 131, pg. 866; 2 Tex.Jur., Title Adverse Possession, Sec. 44, pg. 84. And where as here the property involved is a townsite block, the grazing is only of domestic milch cows, and the fencing is what the Courts refer to as casual, and other facts shown by the record render the claimant's occupancy consistent with a neighborly temporary purpose to use the land at the sufferance of the true owner, something more is required. By casual fencing as here used is meant the making of an enclosure by joining on to existing fences erected for purposes other and different from and wholly foreign to the purposes for which the enclosure thus made is to be used. That an enclosure is formed by casual fencing does not in and of itself establish the use and occupancy of the enclosure to be non-adverse. That it does is intimated in some of the cases, but we find no direct authority for the proposition and do not consider it established. See Peveto v. Herring, Tex. Civ.App.1946, 198 S.W.2d 921, where it was said of casual fencing relied on under

the ten year statute, but in connection with notorious and overt verbal assertions of claim of right. "The fact that fences belonging to other persons, which were erected to enclose other land, were used as a part of the enclosure along the south and perhaps along the western boundaries of the land was at most only a circumstance bearing upon the character of the notice given by appellants' use of the land, and did not prove, as a matter of law, that appellants' possession was insufficient to convey notice of appellants' adverse claim or that said possession was not exclusive." The character and extent of fencing must always be considered along with other facts in the record. However, casual fencing is a weakening element in a limitation claimant's case, and where as here the fencing is not only casual but practically the whole of it constitutes a purpresture in the public way, and encloses a temporarily unused but substantial portion of the public streets, the claimant's asserted claim of right remains far from proved when nothing more than grazing within such fences is shown. Use and occupancy under such circumstances bespeaks transiency and repels the idea of permanency. It surely does not unmistakably suggest hostility to the rights of the true owner. Since the fencing was practically all in the public way, it was practically all subject to summary abatement as a public nuisance. The record owner was entitled to assume that Mendoza knew this. He was charged with notice of it, and his intention evidenced only by such fencing and use must be inferred accordingly. Compare Deep Rock Oil Corp. v. Orsborn, Tex.Civ.App.1953, 259 S.W.2d 625. So plaintiff fails to make out a case of "claim of right" by his fencing and use, and as we have pointed out the record contains no other competent proof of the adverse quality of his occupancy. The opinion evidence referred to above was incompetent for this purpose. Orsborn v. Deep Rock Oil Corp., Tex.1954, 267 S.W.2d 781. A claim of right must be supported either by overt assertions, or by proof of open and visible acts in relation to the land.

There are other reasons we think why the proof fails on the hostile quality of plaintiff's possession.

■■■ His improvements were all on the 30 foot planting area and were erected at a time when the streets as well as the planting area were enclosed by John L. Belch's fences. Apparently plaintiff and Belch used the total enclosed area indiscriminately for grazing their respective cattle. Mendoza's grazing on Block 44 was therefore originally by Belch's sufferance, who, it is conceded, was then in possession of Block 44 under acknowledgment of the record title. So it would seem that Mendoza's original entry was likewise in acknowledgment of the record owner's title, and his continued and exclusive use and possession after Belch left and he took over alone was in law presumably also in subordination to the record title at least until such time as the record owner be visited with notice of repudiation of that title. See 2 Tex.Jur., Title Adverse Possession, Sec. 75, page 144. There is no proof of such notice until the filing of this suit in 1954.

Then again there was no proof that plaintiff ever claimed any part of the land within the enclosure except Block 44. Apparently he made no claim to the 30 foot strip south of the railroad property or to the public streets. While he could not successfully claim the public streets, Art. 5517, V.A.T.S., he could have claimed the 30 foot planting area. However, he apparently did not do so, because when he moved from the section house, the section foreman knocked down one or more of plaintiff's sheds, and plaintiff made no complaint. This is not the attitude of an owner or claimant of lands and improvements.

We have not been cited to, nor have we located any Texas State authority involving facts fully or even fairly comparable to those involved in the present case. However, we are cited to Delany v. Padgett, 193 F.2d 806, 810, a decision by the Fifth Circuit Court of Appeals affirming the ruling of Judge Kennerly of the Southern District of Texas in directing a verdict against a limitation claimant under facts which, so far as material, are hardly distinguishable from those in this record. In that case there was casual fencing across a public road and grazing of cattle for the ten year statutory period. However, the claimant though claiming the land of the defendant within his enclosure, did not claim the lands of other record owners within the same enclosure.

Judge Hutcheson, who has a long and intimate familiarity with the Texas decisions in writings for the court, says:

"It is also clear that, as interpreted by the courts, they do not require any belief on the part of the possessor that he has any right to, or claim upon, the land except that evidenced and ripened by his open and notorious possession. Houston Oil Co. v. Brown, Tex.Civ.App., 202 S.W. 102. These same authorities do, though, make it perfectly clear that the claim of right referred to in the statutes means a bold and open, a downright and persistent claim asserted not furtively by stealth and artifice, but openly, notoriously, unequivocally, adversely and continuously. Because this is so the decisions under these statutes take pains to leave in no doubt that if there is any break or chink in the armor of proof which a possessor must put and keep on when he undertakes to acquire a title by limitation, such as a single lisp of acknowledgment, the slightest uncertainty or equivocation in the openness and downrightness of his claim, a failure to comply precisely and exactly with the statutory provision, it is, and will be, fatal to the claim. Thus, as the decisions cited by the district judge show, one cannot support a claim of adverse possession, that is, that, by enclosing it, he has taken the land into such possession as will support a limitation title, when all that he did within the ten year period was, for the purpose of running cattle inside the enclosure thus formed, merely to run connecting lines between two or more existing fences and across a public road which, after two days, was opened again, a cattle guard being furnished by the county authorities.

"Neither can one who, as here, runs cattle on a pasture thus enclosed, claim title by adverse possession to a particular tract when the pasture contains many tracts of land held under separate ownerships and distinct chains of title, as to some of which he recognizes the title of the owner, merely because this tract is included in this general enclosure. Especially is this so when, as here, the defendant's possession was qualified by a most general agreement with Mr. Maco Stewart, that he was not claiming adversely any of the lands in his pasture that belonged to Mr. Stewart or to any of Mr. Stewart's clients.

"Under testimony of this kind, in order to start limitation running as to tracts situated with reference to the enclosure, as plaintiffs' land is, it would be essential that it be possessed, used, and cultivated in such a way as to unequivocally give notice of defendant's adverse claim to it, as distinguished from other lands in the same pasture as to which he admits he was making no claim.

"We agree with the defendant: that the policy of this state, as set out in the statute of limitations of ten years, and in the decisions construing them, is to give effect to an adverse holding by a naked possessor when it measures up to the statutory requirements; and that where there is any credible evidence giving support to the required legal elements of the claim, the question is for the jury. There can be no doubt, though, that the burden to maintain it rests heavily on a person making the kind of naked claim made here under circumstances of the kind this record discloses, and that, if his claim is wanting in any of the legal aspects of such a claim, a verdict may and should be directed.

"The defendant is an officer of the law, a justice of the peace, a respected member of his community. His office and his standing in the community for integrity and upright dealing with his neighbors, as shown by his testimony as to his dealings with the Stewarts, presents a picture which is legally incompatible with the claim he makes here. This is: that the casual kind of fencing of the large tract and the use that was made of the land for running cattle was not with the neighborly intent of using the land by the sufferance of his neighbors, but with the unneighborly one of taking it away from them, and that this unneighborly intent was made *unmistakably manifest* to those neighbors.

"Situated thus, he could not, by the casual joining of fences and the mere pasturing of cattle within the enclosure thus conveniently formed, acquire a title to plaintiffs' land without bringing clearly home to plaintiffs by open, hostile, and unequivocal acts that he had included plaintiffs' land in the pasture with the intent to misappropriate it."

If Delany v. Padgett is to be distinguished from the present case, it is only on the adventitious circumstance that the limitation claimant there was an officer of the law—a Justice of the Peace. However, it cannot be that because one holds a public office he is thereby and ipso facto of greater integrity or better reputation than other less exalted citizens of untarnished repute. For ought the record shows plaintiff Mendoza is an honest, upright, and respected member of his community. We think he is entitled to that presumption.

From what has been said it follows that the judgment of the trial court must be reversed. It appears that the case has been fully developed, and judgment will be here rendered for appellants.

Reversed and rendered.