Charles E. WILSON et al., Appellants,

v.

Margaret B. ROGERS, a Widow, et al.,
Appellees.

No. 13217.

Court of Civil Appeals of Texas.

Houston.

Jan. 19, 1961.

Rehearing Denied Feb. 16, 1961.

Higgins, Evans & Goff, W. D. Evans, Angleton, Fountain, Cox, Gaines & Fox, Joyce Cox, Houston, for appellants holders of the Smit titles.

Kleinecke, Nussbaum & Piperi, H. E. Kleinecke, Jr., Galveston, by appointment for remaining appellants cited by publication, Charles E. Wilson and others.

Ralph Crawford, Henry W. Flagg, Galveston, for appellee.

WERLEIN, Justice.

Charles E. Wilson et al., the heirs of J. J. Smit, and W. D. Evans, appeal from a judgment awarding appellees, E. Q. Rogers and wife, title and possession to about 85 acres of land based on a jury finding that appellees and those under whom they claimed had been in peaceable, adverse and continuous possession thereof, using same for grazing purposes for eleven years [1] or more before November 1, 1949.

The accompanying plat shows the lands in controversy and adjacent tracts. Fences are indicated by lines overlaid with "x" marks. Their location will be developed by the evidence, including the testimony of a witness who made a survey and a map in 1951. The broken line on the east was not shown by his survey and it is indicated as the Moller west fence, the location of which is subject to the testimony of several witnesses as later shown.

[1]. The limitation period was extended one year, J. J. Smit having died in 1943, and there having been no administration of his estate (Art. 5538, V.A.T.S.)

PART OF
THE ALTA LOMA
SUB'N, GALVESTON
COUNTY, TEXAS

Contentions have been raised that require a statement of the pleadings. Margaret B. Rogers, a widow, originally sued November 9, 1949, alleging that on November 1, 1949 she had perfected title under the 10 year statutes to lands described as "Lots 436, 437, 438, 457, 458, 459 and 479, First Addition to Alta Loma," Galveston County, Texas, comprising about 150 acres. Defendants, Charles E. Wilson et al., J. J. Smit, J. M. Burr and J. N. Taub, "and if dead, their unknown heirs," etc. were cited by publication. C. T. Weiss was served personally. Only he and the Taubs initially filed answers.

On May 19, 1954, pursuant to Mrs. Rogers' motion, her suit against the Taubs involving Lot 479 was severed and a consent decree was entered awarding it to them. On June 14, 1954 she dismissed as to Weiss and all of Lot 436 except the small quadrilateral tract in its northwest corner containing approximately two acres.

By her first amended petition filed June 17, 1954, Mrs. Rogers narrowed her suit to Lots 457, 458, 459 and those portions of Lots 437, 438 and the two acre tract in the northwest corner of Lot 436, that lay west of the Rogers east fence line, also called the Blimp Base west fence line. On July 30, 1954, she was awarded judgment for such lands against the remaining defendants and in April, 1956 she deeded same to her son, E. Q. Rogers, and his wife, Bertha, appellees here. However, on October 9, 1956, pursuant to a motion by the Smit heirs alleging J. J. Smit had died in 1943, etc., the judgment of July 30, 1954 was set aside and a new trial ordered.

On March 25, 1957 the Smit heirs filed an amended answer and joined by W. D. Evans, cross-acted against Mrs. Rogers, E. Q. Rogers and wife, Bertha, seeking recovery of Lots 459, 457, 437, the south 17.42 acres in Lot 436, and the south 10 acres of Lot 438, which included lands not sued for in Mrs. Rogers' first amended petition. Mrs. Rogers then joined by appellees, on April 23, 1957 filed a second amended peti-

tion alleging their technical dispossession on November 1, 1949 and asserted title under the 10 year statutes to the same property described in Mrs. Rogers' first amended petition. They also disclaimed all land in Lots 436, 437 and 438 that lay east of the east fence line of the Rogers pasture. The Wilson group, through an attorney ad litem, asserted record title to the North ½ of Lot 438 and the two acre tract in the northwest corner of Lot 436. Burr answered as to Lot 458. These were the pleadings when the cause proceeded to trial.

J. M. Burr and W. D. Evans, so it was stipulated, held record title to Lot 458, and record title was in J. J. Smit and his heirs to Lots 437, 457, 459 and the south 10 acres of Lot 438.

Based on the verdict, appellees were awarded judgment against the Smit heirs and W. D. Evans for Lots 457, 459 and those portions of Lot 437 and the south 10 acres of Lot 438 that lay west of the Rogers pasture east fence line, and also against the Wilson group for the north ½ of Lot 438 and the so-called two acre tract in the northwest corner of Lot 437 that lay west of said fence line. Lot 458, however, was awarded to Burr and Evans as being wholly surrounded by lands claimed or fenced by appellees or others and no complaint is made of that ruling. From this judgment appellants have appealed.

In Points 1, 2 and 4 appellants assert that the Trial Court erred, as a matter of law, in not holding that the evidence was inadequate under the provisions of Articles 5510 and 5515, Vernon's Annotated Texas Civil Statutes, either to raise the issue of adverse possession or to justify its submission to the jury, and that the alleged period of adverse possession was neither commenced nor continued under a claim of right. We do not agree.

It is true, as appellants contend, that since appellees rely on these statutes to establish their title they have the burden of proving the elements of adverse possession

including a claim of right by proof that is clear and satisfactory. Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781; Houston Oil Co. v. Jones, 109 Tex. 89, 198 S.W. 290; Moore v. Wooten, Tex. Com.App., 280 S.W. 742. However, where the evidence is conflicting its weight is a question of fact for the court or jury. Arnold v. Jones, Tex.Civ.App., 304 S.W.2d 400; Lockin v. Johnson, Tex.Civ.App., 202 S.W. 168. If, therefore, there is some evidence of the quality and character required to support the statutory elements of adverse possession, a jury issue is raised and in reviewing the proof it must be considered in its light most favorable to support the verdict, and to sustain appellants' contention it must appear there is no such evidence in the record upon which the jury could have based its finding. Arnold v. Jones, supra; Wynn v. Mendoza, Tex.Civ. App., 287 S.W.2d 217, ref., n. r. e.; Hammond v. Eplen, Tex.Civ.App., 216 S.W.2d 258.

The evidence, therefore, must be reviewed, and since appellants' Point 5 raises its sufficiency to support the verdict, the proof will be stated more fully than is ordinarily necessary at this point. Appellees claimed through L. R. Casteel who, joined by his wife, on December 13, 1943, quitclaimed to Margaret B. Rogers, a widow, tracts and parcels of land described as Lots 436, 437, 438, 457, 458, 459 and 479 in Alta Loma Townsite "and surrounding acreage according to the map or plat in common use, together with all improvements." As above stated, on April 24, 1956, Mrs. Rogers conveyed to appellees Lots 437, 438, 457, 458, 459 and the two acre tract out of the northwest quarter of 436, according to map of Alta Loma Townsite and surrounding acreage in common use.

L. R. Casteel testified that before 1938 he had operated a dairy about two miles north of this land with about 100 cows and calves that grazed free-range. Between "right after" July 4 and the last of July, 1938 he, with the help of his two adult sons and a nephew, fenced a tract enclosing between 150 and 180 acres. When he started fencing there was a three-wire fence on the east known as the west fence line of the Moller pasture. It needed repairs, which he made with posts and wire. It ran in a northeasterly and southwesterly direction. Its south end was tied to the Hughes pasture north line fence that ran east and west from that point several miles in each direction. It was a good four-or five-wire fence. It needed no repairs. On the north he laid out lines where there were no fences, and he, with his sons' and nephew's help, built a fense of new barbwire and cedar posts by tying onto the Moller fence on the east and running west but "not straight through" because "it jogged back a ways to the south and ran west a ways and south again." He built the west fence by tying onto the Hughes north fence and ran north until it joined the other fence he built, thus completely enclosing the pasture. The fences he built were two-wire fences. The Moller fence became his east line, the Hughes his south line, and the fences he built were his north and west lines. He was on the land the day before trial (April, 1957) and all of the land in the Rogers pasture was in the tract he fenced in 1938. The only effect of moving any fences since that time was to cut out some land—not "to put in" any land.

Casteel had no deed but he knew about the Statutes of Limitation of Texas and his purpose in building the fences was to claim it under the 10 year Statutes. Before doing so he tried to locate the owners by going to the records in Galveston and getting the names and addresses. He wrote to each, giving his return address, saying he would be interested in buying or leasing but if he got no reply within 90 days he was going to fence the land and claim it under the Statute of Limitation. All letters came back unclaimed but two and he heard from none. He waited 90 days or more and "right after July 4" he started fencing the land and kept on until he fenced it, carrying through his statement to claim it under the

Statute of Limitation. After he fenced it if anyone to whom he had written had come to see him about the land he would have told him if he recovered it, it would be through process of law. He would not have given it back.

Immediately after fencing it he put dry cows and calves in the pasture and at all times during the 5½ years he kept from 25 to 50 head in there. There was no land in the pasture that he did not claim. He also made hay on the land and claimed it openly, notoriously and adversely to the world from July, 1938 until he sold it in December, 1943 to Mrs. Rogers for $300. During this time he maintained the fences around the land and had it completely enclosed by good substantial fences capable of holding cattle and livestock of ordinary disposition. It was sufficient to hold his cattle and it kept other cattle out. He had a wire gate on the north and one on the west. No well or windmill was on the land but there was a slough in the southwest corner that ordinarily held water. In extremely dry spells he had one of his sons drive the cattle to water each evening.

About 1942 the Government, in condemning a large tract for a blimp base by court order, tore down the Moller west fence and erected a new woven wire fence at the same angle as the former. Casteel said this resulted in the Government's taking a strip a few feet wide off the east side of his pasture. He never collected any money for it. It was put there before he knew it. When he learned of it a few days later he immediately tied his fence to it, making the blimp base fence his east line. Its only effect was to cut out a small part of his pasture; no new land was added. It moved his east line west "just a few feet" at the same angle.

Since he sold the land to Mrs. Rogers 20 acres "down in the southwest corner" (obviously the Taub tract) had been "taken out." His south line was the Hughes fence. There was a railroad dump "running through there" which he crossed with his west fence and tied onto the Hughes fence south of the dump. He didn't know where the McVea land was but he did not join a fence on McVea's tract. In laying out his fences he stepped the distances. He didn't know whether the lines were correct. He was not a surveyor but he was positive he fenced the lots recited in the deed to Mrs. Rogers though his south line extended to the Hughes fence, some distance south of those lots.

On cross-examination he conceded he paid no taxes, nor did he ever render the property. He agreed he "didn't figure on" putting out money until he "got clear title" and he used it "for nothing" without paying taxes.

Clarence R. Casteel, age 44, lived with his father until September, 1939. His testimony was the same as his father's with reference to the location and condition of the Moller and Hughes fences, the repairs made to the former and the manner and places in which they built the new two-wire fences within two weeks "right after" July 4, 1938. His father put cows and heifers in the pasture "right away"; always grazed cattle in there; the fences turned other cattle and were kept in good repair. He kept some dry stock in his father's pasture until he sold them after he moved. Brahma cattle from the Hughes or Moller pastures did not break through the fences into Casteel's pasture nor were they driven through them.

Fred Conzack had lived in the vicinity 45 years. He made hay on the land before and after it was fenced. In 1938 he made hay on it with Casteel. It was fenced with a new two-wire fence put up by Casteel on the north and west sides that joined the Hughes on the south and the Moller on the east. Casteel did the cutting and baling. He "just hauled" the hay in a new truck he purchased in September, 1938. Only Casteel and his cattle were in the pasture when they made hay. Its lower end was quite wet.

F. H. Huntington first knew of Casteel's pasture "around" 1939 or 1940 when Casteel started moving cattle down there. The date he was "just estimating." In 1944 he made hay in the pasture for Mr. Schwiem who leased it from Mrs. Rogers. The fences were in good shape and "looked like" they had been up at least five or six years. Mrs. Rogers talked to him about his making hay in there for Mr. Schwiem. The Hughes fence was the south fence line. He went through a gate on the north side going in and out. The fence was as good as the average. It was "all the way round the pasture. The cattle had been taken off." If cows were in there "you couldn't get enough grass to make hay." How long they had been off he didn't know. He estimated six months. It could have been less —not too long because the grass wasn't too long. He noticed where cows tracked and bedded down at night. Just how long cows must be off land depends on the number of cattle. He had made hay where they never took cattle off the pasture.

Everett Moore lived near the land since 1934. He knew L. R. Casteel and the pasture. He remembered Casteel fenced it in 1938 during the last part of the summer. Appellants showed that on a previous trial in 1954 he testified it was fenced a few weeks or a couple of months before February 4, 1939. After fencing it, he said, Casteel always had cattle in the pasture until he sold out. He admitted he was in the army 18 months in 1942 and 1943, but when he was home on furloughs cattle were in there. The Moller fence was Casteel's east line fence and Hughes' his south line fence. Cattle had been in the pasture ever since Casteel fenced it in 1938. The fences turned and held cattle of ordinary nature and disposition. He knew of no time when cattle were not in the pasture, including when people made hay. It was a good pasture. Immediately after Mrs. Rogers acquired it, she told him he could turn cows in the pasture. He did so, recognizing her ownership. That was after Casteel left Alta Loma and before Mr. Schwiem leased

it. When Schwiem leased it, he removed his cattle. Appellants showed that in the 1954 trial, Moore had testified that after Mrs. Rogers bought from Casteel, Fred Schwiem rented the pasture from her and kept it several years.

Two former Texas Livestock Sanitary Commission employees, Evans Franks and Eddie Moore, testified they knew L. R. Casteel and his pasture. They inspected cattle in it many times and rode the fences. Franks, a rancher, was with the Commission from 1938 until 1942, and Moore during 1941 and 1942. The Moller fence was Casteel's east line, the Hughes north fence his south line. Casteel either in 1938 or the first part of 1939, he believed it was 1938, put up a wire fence on the north and west sides of the pasture and always kept his "young stuff" and dry cows in there until he (Franks) quit the Commission in December, 1942. Moore said the fences were good substantial fences and completely enclosed the Casteel pasture in 1941 and 1942 and were of such construction as to turn and hold cattle of ordinary nature and disposition. Casteel's cattle occupied the pasture during 1941 and 1942. He checked every 14 days to see the cattle were dipped. The fences on the north and west were not brand new but had been built within four or five years.

Appellee, E. Q. Rogers, testified his mother, Margaret B. Rogers, conveyed the land to him and his wife during the pendency of the suit. (The deed showed "April 24, 1956"). He knew the land since boyhood, having hunted on it. Casteel fenced it in 1938 before hunting season. He got Casteel's permission in 1938 to hunt on the land. He remembered when his mother acquired it from Casteel for $300.00. She immediately went into possession. First she gave Everett Moore permission to turn his cattle on it. Moore used it from the time she acquired it until she leased it to Mr. Schwiem. He identified the pasture lease dated July 27, 1944 from his mother to Fred Schwiem for one year with privilege of four years extension. He took Mr. &

Mrs. Schwiem's acknowledgements thereon. It described the land as Lots 436, 437, 438, 457, 458, 459 and 479, Alta Loma Townsite "and surrounding acreage according to map and plat in common use with all improvements." It provided Schwiem would replace bad posts and put another wire on the fence where it only had two wires. It recited that "The fence which defines the west side of this property belongs to J. C. McVea" and Schwiem would build "a 3-wire fence on the line dividing the McVea land from the lots leased." Schwiem held the land six years and the Wilson Brothers leased it, grazing it two years. They always had cattle on it when he went there to look at the fences and general upkeep. The fences were kept in reasonable repair at all times while his mother owned and claimed the land. While Huntington was making hay he saw cattle grazing in the pasture. His mother held domain and control of all land in the pasture, claiming ownership, title and all rights to it from her acquisition until she conveyed it to him and his wife. He never knew of any cattle breaking into the pasture. He knew the fence line between Lots 458 and 479. It was put there in 1956.

On cross-examination Rogers identified a map of a part of the Alta Loma Subdivision. It showed land between the south line of the Subdivision and the old railroad dump. His mother executed an oil and gas lease on the land in March, 1954 by a metes and bounds description pursuant to a survey made by the oil company, which followed the fence lines of the pasture as they then were. Briefly stated, the record shows the description followed the fence lines as shown on the accompanying plat with the Taub and Weiss tracts being omitted therefrom. He stated that all the land that Casteel originally fenced was not in the pasture at the time of trial in April, 1957, the Taub and Weiss tracts having been excluded. The Taubs, he believed, took a consent judgment against his mother. As to the date he didn't know. That was before he became an owner. After he filed suit, he recognized Taub's title to Lot 479. As to the Weiss claim to the small tract in Lot 436 "in the other law suit," he didn't remember.

Fred Schwiem, a dairyman, testified he leased the Casteel land from Mrs. Rogers in July, 1944. He occupied and used it five years, and maybe thereafter. During that time he grazed cattle on it, starting immediately after getting the lease. He owned the adjoining pasture to the north. There was a gap between them. It stayed open all the time and combined the leased pasture with his. When he leased it there were only two wires on part of the fences. Pursuant to the lease, he put another wire on the fence where there were only two wires, but he never moved any fences. He had ranch cattle, half Brahmas, in there. They were wilder than milk cows. Throughout the time he had it his cattle grazed or had access to graze on the leased pasture. Huntington made hay on it for him one time, but the gap was down so the cattle could go back and forth. If Huntington didn't see cattle they could have been on the north end. The fences were kept in good shape and were sufficient to hold his cattle. They never got out. The only time he had a fence down was for two days when Pan American broke it. Four or five cows got out, but he repaired it the day he discovered the break. The Hughes fence was the south line. It wasn't "in too good shape" but he kept it in repair. He did so because the wire was old just from deterioration and broke, but during all the time he was there it was sufficient to turn cattle of ordinary disposition. It stopped his Brahma cattle. They never did go through it. While he had the pasture, his cattle were never excluded, including the time he made hay.

He put an extra wire on the north fence going east to west and from the north going south on the west side. "Up on the northwest was a corner known as the McVea tract that was fenced out. There was just one fence on it, on the east and south sides." He put "a strand of wire on that

fence and placed some posts between others." Two strands were on the fence but he put one "higher up." He remembered Casteel's fencing the land but not the date, and that Casteel had pastured it. That was before he leased the land from Mrs. Rogers.

On cross-examination, he couldn't remember if his agreement with Mrs. Rogers was written or oral, but the contract required that he put up additional fencing. Probably he would have anyway because the fence was insufficient to hold "that type of cattle." He didn't move any fences in putting the wire on the fence between the Casteel and the McVea land. While he had the lease his pasture to the north was fully enclosed with a fence. He kept all of his fences up, including that next to the land in issue.

Carl Cowan knew the Casteel or Rogers pasture was fenced in 1938. The Hughes fence was a barbwire fence, maybe four wires. It held cows. On many occasions he saw cows, mostly Brahmas, ranging in the Hughes pasture. He knew of no occasion when they got out, nor had he heard anybody complain. Mrs. Rogers had control of the pasture since Casteel moved. He knew she leased to Schwiem and Linkey for grazing. They had cattle out there. He knew it was a good fence because it held their cattle.

Mrs. Margaret B. Rogers, age 80, a widow, testified she purchased the pasture from Casteel December 13, 1943, immediately took possession and asserted claim adverse to everybody else "by limitation and otherwise," at all times until she conveyed it to her son and his wife. First, she leased it to E. E. Moore for grazing, next to Fred Schwiem; then to the Wilson boys; thereafter to Fuller; and Jake Linkey was using it at time of trial. She paid back taxes as evidenced by her check for $953.04 dated January 6, 1948, to satisfy a tax judgment in State v. J. J. Smit et al.

On cross-examination she said she had been on the land many times. She wouldn't agree she paid the tax judgment because the land was ordered sold. She knew they were due and she paid them. She denied she failed to record her deed until 1948 because she was keeping it secret. She conceded that when she filed suit in 1949 Weiss was a party and he and his land were dismissed. As to the Taubs, she didn't remember. When she was shown that the Taubs were severed from the suit on May 19, 1954, and on the same day a consent judgment for Lot 479 was entered in their behalf, she said it was "some kind of paper," she didn't know what it was. When counsel stated, "Then you were not claiming all the land in the enclosure," she said she did at one time and had exclusive control of it until she "gave *that* to Mr. Taub." She wasn't sure she knew Smit. A man came to her home before she had anything to do with the land and said he was. She pointed it out to him. If Smit had "come down" later she didn't think she would have recognized his title. When asked if she would have given him a deed, she replied, "No." Whether the west fence belonged to Mr. McVea, "According to that statement" in the Schwiem lease, she didn't know. She said she believed when Schwiem leased, it was understood he was to take care of the fences.

Lee L. Lowery testified he surveyed the Rogers pasture in 1951. He made a map showing the lot lines and the location of the fences as they were in 1951. As previously stated, his map has been used as the basis for the accompanying plat. He said the south fence line was along the southerly edge of an old railroad dump. Its east line was commonly known as the west line fence of the Blimp Base which traversed the northwest corner of Lot 436, the southwest corner of Lot 438 and the eastern portion of Lot 437 by course and distances as those shown on the accompanying plat. He stated that all lots and parcels of lots described in appellees' second amended petition laid within the Rogers enclosure except the narrow triangular strip 20 feet at its base outside of the west fence line

and slightly north of the southwest corner of Lot 459. Lowery's testimony also showed that the pasture's north fence line was located about 50 feet north of Lots 459, 457, 438 and the two-acre tract in the northwest corner of Lot 436.

Appellants offered a number of witnesses. J. E. Williams, a rancher, and ranch hand for Tigner in 1940, 1941 and 1942, knew the Hughes or Coon Ranch. Tigner had cattle in Hughes' pasture one year, 1940, and farmed rice. The north fence was practically no fence, just a few posts and a little wire. Cattle and horses from Coon's Ranch went through it "into the upper country" on "lots of occasions." He didn't consider a two-wire fence sufficient to turn cattle. They had no dairy cattle on the Hughes Ranch, only Brahmas that were wild. He was down there "off and on" for three years. They "had no trouble" with cattle coming from the north. While he was there just cattle from the Hughes Ranch that would get out and go north.

Mr. Farrer testified that as requested he looked at some land pointed out as that in controversy south of Alta Loma about two weeks before trial in April, 1957. He saw no west enclosure. Traveling east along an old railroad dump he saw a fence with one and two old rusty wires in places. Going to the north side he went through a gap and saw a fence pointed out as the Blimp Base fence. It had one or two wires. The north fence had three wires. He knew nothing about the fences or "anything else" prior to two weeks before the trial. In flying over the land, he saw no corner posts or fence within 500 feet from the southeast corner thereof.

Kiddo Tacquard ran cattle on a part of the Hughes Ranch about seven years. He knew the Casteel or Rogers pasture and the north fence of the Hughes Ranch since 1938 or 1939. Until about 1940 it was kept up but from about 1940 to 1946, when they had no cattle, "the fence did like any wire fence will do, it went down,"

it wasn't sufficient to turn cattle, including dairy cattle. One could ride through it most anywhere, from about 1940 to 1946, but when they started putting cattle back into the Hughes, they "put the fence back up." All he knew Casteel "ever done was to build a little two wire fence on the north side." The Moller fence was "just a little three wire fence, like all us cattlemen build."

The Hughes and Moller fences between the years 1938 and the time the Blimp Base fence was built were sufficient to turn cattle. From 1938 until 1950 he knew "some fellow" was using the Rogers pasture. Mr. Schwiem, Linkey and the Wilson boys had used it. The Wilsons tried to keep cattle in there but didn't. Their cows were in his pasture more than in theirs. The Wilsons used it after Schwiem. The Hughes fence was a four-wire fence with posts 16 feet apart. In 1940 it was a good fence. No one tore it up but barbwire won't last very long, not over ten years if it's a good one. From July, 1938 to 1943, Casteel kept Jersey or dairy cattle in his pasture. Schwiem kept mostly dairy cattle in there. The Hughes fence was built to hold Brahmas, and Casteel's to hold dairy cattle. When a Brahma gets ready to break through or over, they usually do. Concerning his statement that between 1940 and 1946, cattle were in and out of the Hughes and Casteel or Rogers pastures, he said it was the Hughes fence that permitted the cattle to go through.

Clarence Perry knew "about where" the Rogers land was but was "not too well acquainted with" what went on there "outside of the fence" but in 1951 he "happened" to see the south line of the Rogers property. A lawyer from Houston asked him to go there. From the road they walked east until they hit the Blimp Base fence, then turned south until it ran into the old Hughes fence. It was "completely down." No wires were on the posts. He didn't notice "too many posts missing," but "the wires rotted and fell off."

J. J. Fenn, called "Button," a cattleman, had pastured cattle on the Hughes pasture from about 1910 to the time of trial, but not every year. The Hughes fence wasn't sufficient to turn cattle. During that time some cattle from the Hughes would go north "into this other pasture." He "never noticed the Hughes cattle doing it so much," but some did. The years he "disremembers," but it was after he bought the Hughes cattle. He remembered when the ranch was sold to Briscoe. It was " '39 or '40", he believed. At that time some of the fence on the north of the Hughes land was in good condition. The fence that joined the land pointed out to him on the ground "wasn't in too good a shape." Asked whether it would turn cattle of ordinary disposition, he said, "If they were cattle that didn't intend to do that, Yes, sir, it would." He also said it would not. Fenn agreed on cross-examination that cattle dipping was required from 1936 until 1942. He knew the Hughes north line fence was the dividing line for dipping. When asked if "it had to be a pretty good fence, for that," Fenn replied, "Well, as I say, it was—." As to its having "to be a fence that would turn cattle—both range and dairy cattle, * * *" he said, "It should be, yes, sir." "At times, it was."

Mr. Fenn knew Fred Schwiem slightly. They never had any trouble with Mr. Schwiem's cattle. His cattle stayed in his pasture. Mr. Schwiem occasionally had some trouble with his (Fenn's) cattle— Brahmas and some others, too. He had seen certain cattle that sometimes would break through most any fence. They were not the kind of cattle referred to as of ordinary nature and disposition. The Wilson boys had cattle in there and they told him they had leased the land from Mrs. Rogers. Whether it was after Schwiem gave it up, he couldn't say for sure. There was nothing to keep his cattle from roaming at large, all over the country, for several years. He pastured with Joe Hughes and Hughes was supposed to keep up the fences. If anybody else kept up the fence (between the Hughes and Rogers pastures), he didn't know. They could have and he wouldn't know. He bought Hughes' cattle around 1940 and Hughes tried to keep the fence up because cattle were in there. He knew of the stock law requiring everybody to keep their cattle enclosed and forbidding their roaming at large. They tried to comply with that law to a certain extent.

Dan Bradley worked for J. H. Tigner from 1941 through 1943 on the Coon Ranch, riding pasture. In 1942 Mr. Tigner started rice farming down there. About a week before trial the land in suit had been pointed out to him. At its southeast corner he saw nothing but an old fence he could identify. He went back and entered from a road on the north side. While he was employed, Tigner had fifty to sixty horses on the Coon Ranch. The fence pointed out was there while he was with Tigner. In 1942 and 1943 it was an old fence in bad shape, a couple of rusty wires, a few posts and two or three wires, "wasn't any good to amount to anything." From his knowledge of working cattle he said the Hughes north fence adjoining this property wasn't sufficient to turn livestock of ordinary disposition. Sometimes they would get out. As to repairing the fence, sometimes he would tie up a wire or two, if he felt like it. The fence was already down and let the cattle roam at large. When they wanted to come out—the fence wasn't so good— they got out and would go up in that little pocket on the north side of the fence where the land in controversy was.

Appellants contend that appellees' proof is so contradictory, confusing and wanting in sufficiency that it fails to raise the issue that Casteel's possession was either commenced or continued under a claim of right as contemplated by Articles 5510 and 5515, V.A.T.S. They say that Casteel's letters to the last known owners offering to lease or purchase the lots constitute a recognition of ownership in others, which precludes his possession from being commenced or continued under a claim of right. In

this connection Mhoon v. Cain, 77 Tex. 316, 14 S.W. 24, and Satterwhite v. Rosser, 61 Tex. 166, have been cited. The proof in those cases showed without question that the adverse claimants entered into possession and thereafter continued such possession in subordination to the title and recognition of rights of others.

■ The facts before us here, however, are quite different. Though Casteel did offer to purchase or lease from the last known owners, he also stated in his letters that if he did not hear from them within ninety days he would then fence the land and claim it under the statutes of limitation. His testimony shows that it was after the ninety days had expired when, in July, 1938, without having heard from any of them, he built the fences to enclose the land and immediately thereafter he put cows and calves in the pasture and kept between 25 and 50 head therein continuously until he sold it to Mrs. Rogers in December, 1943. His testimony is also clear that he used it as pasturage and claimed it to the exclusion of all others. Under this proof the adverse character of Casteel's possession was not prejudicially affected by the fact that he had previously offered to lease or purchase the land. Especially is this true in view of his testimony that if anyone to whom he had written had asked him for the land he would have told him if he recovered it it would be by process of law. He would not have given it back. Cartwright v. Alexander, Tex.Civ.App., 252 S.W. 1073; Daughtrey v. New York & T. Land Co., Tex.Civ.App., 61 S.W. 947, writ dism.; 2 Tex.Jur.2d § 88, p. 182.

Appellants suggest that Casteel's possession should be tested by the decisions in Holland v. Nance, 102 Tex. 177, 114 S.W. 346, and Smith v. Jones, 103 Tex. 632, 132 S.W. 469, 31 L.R.A.,N.S., 153. In the first of these cases the adverse claimant asserted a limitation title to 321 acres of unfenced land out of adjacent lands when he, through mistake, in fencing his own land, encroached a few varas on the adjoining property. In the latter case the claimant admitted that he held possession under the belief that it belonged to the State. It was held, therefore, in each of these cases, that the possession was not hostile to the true owner. Manifestly the issues involved in those cases are not applicable to those before us here. Casteel's testimony shows that all land which he claimed was enclosed by his fences and there was no land in his pasture he did not claim. He was on the land the day before trial and there was no land within the fence lines that was not in his pasture when he fenced it in July, 1938, and any changes in the fence lines had resulted in cutting out some land, but no new land had been added.

Appellants contend that under the decisions in Stevens v. Pedregon, 106 Tex. 576, 173 S.W. 210, and Houston Oil Co. v. Stepney, Tex.Civ.App., 187 S.W. 1078, writ ref., appellees' proof was wanting in sufficiency because there was no evidence that Casteel's entry and retention of possession was under a claim of ownership. Any such interpretation of those holdings was expressly renounced in the later decision, Houston Oil Co. v. Jones, 109 Tex. 89, 198 S.W. 290, where it was succinctly stated that the Supreme Court had "a number of times declared that a naked trespasser may acquire a limitation title to land under the ten years statute." As to this contention the Supreme Court left no room for argument in the following statement:

"The 'claim of right' to which the statute refers simply means that the entry of the limitation claimant must be with the intent to claim the land as his own, to hold it for himself; and such must continue to be the nature of his possession. That it is necessary that his entry upon or holding of the land be founded upon his having some character of title is opposed to the theory of the ten years limitation statute."

Immediately following the foregoing quotation is the concluding paragraph of the opinion, wherein it was said that in Houston

Oil Co. v. Davis, a writ of error had been granted "which has not yet been decided, involves this question," and the court deems "it best to relieve the opinions of the court of any possible doubt upon it." Reference to Houston Oil Co. v. Davis, Tex.Civ.App., 178 S.W. 669, 670, will disclose that a writ of error had been granted and from our search of the reports it appears that the Supreme Court wrote no further in disposing of it.

Apropos to the precise contention urged by appellants, we think it significant that the opinion of the Court of Civil Appeals in that case sustaining the appellee's limitation title quoted the trial court's fact findings, the first of which reads in part as follows:

"I find that Henry Davis in 1891 *took possession* of the Houston Tap and Brazoria Railroad Survey No. 15 *for the purpose of acquiring 160 acres thereof by limitation,* and cleared, fenced, and put in cultivation about 7 or 8 acres," etc. (Italics ours.)

■ In our opinion, the taking of possession of land by one for the declared purpose of claiming it by limitation is clearly contemplated by the provisions of the statutes shown by the Supreme Court in Houston Oil Co. v. Jones, supra.

■ Appellants infer that the testimony of E. Q. Rogers concerning the severance of the Taub tract from the suit, Mrs. Margaret Rogers agreeing to the Taubs' recovery of Tract 479, and her dismissal as to Weiss and his land in Lot 436, is prejudicial to their limitation claim. These matters were disposed of in 1954, about two years before appellees, E. Q. Rogers and his wife Bertha, acquired an interest in the land (1956) and some five years after the limitation title upon which they rely in this suit had matured on November 1, 1949. Neither were they parties to the suit until 1956. We think that this testimony is of no controlling effect. After a limitation title has been perfected, the rights of the

claimant cannot be affected by a recognition of title in another. Like other titles to land, a limitation title cannot be defeated by a gratuitous acknowledgment that occurs subsequent to its acquisition. 2 Tex. Jur.2d, p. 181.

■ Appellants urge that Casteel's fencing of the land was only a casual fencing such as that in Wynn v. Mendoza, Tex.Civ. App., 287 S.W.2d 217, ref., n. r. e. They premise this contention primarily on Casteel's use of the Moller fence on the east, though he repaired it, and of the Hughes north line fence on the south and the fact that he built only the north and west line fences to enclose the land for pasturing cattle. This at most was only a mitigating circumstance bearing on the character of notice of Casteel's use of the land but it did not, as a matter of law, preclude Casteel's use and possession of the land from being sufficient to give notice of his adverse claim thereto and that his possession was exclusive. Peveto v. Herring, Tex.Civ. App., 198 S.W.2d 921; Click v. Collins, Tex.Civ.App., 273 S.W.2d 90, ref., n. r. e.

Appellants also contend that Casteel did not erect the fence along the east and south lines because of the recitation in Mrs. Rogers' lease to Schwiem that the fence belonged to McVea. This lease was executed in July, 1944 and though Mrs. Rogers was a party to it, we do not think that recitation overcomes Casteel's testimony that he and his sons constructed the fence with "a jog" in it along the west side of the pasture to enclose it in July, 1938. He did not know McVea but he was positive he did not tie onto McVea's fence. Schwiem testified that in putting the third wire on the fence he did not move any fence posts. He only added some between others.

■ We cannot agree with appellants' position that Casteel's failure to protest the erection of the Blimp Base fence was fatal to his claim. Nor was the breaking of his fence and the taking of "a few feet," possibly as much as 20 or 30 feet, off his land

parallel to and west of the existing Moller fence. The land was taken before he knew it and the proof shows that immediately on learning of it a day or two later, he went down to the pasture and tied his fence to it. Its only effect was to cut off a narrow strip of his land. No new land was added.

Appellants contend that no limitation title matured against the 25% interest of the defendant, Michael Smit, because he died October 18, 1948, and thus the running of the statute would be tolled for one year thereafter. This contention is untenable for the reason that his death was not pleaded and the matter was presented for the first time on appeal. See Wixom v. Bowers, Tex.Civ.App., 152 S.W.2d 896–902; 28 Tex.Jur., p. 295, Sec. 201.

Appellants assert that the jury's finding is contrary to the overwhelming weight and preponderance of the evidence. We have read the statement of facts and have concluded that we cannot say that the verdict is so contrary to the overwhelming weight and preponderance of the evidence as to be wrong and unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660; Tudor v. Tudor, Tex.Sup., 314 S.W.2d 793.

We do not agree that the Trial Court erred in refusing to hold for appellants under Article 5511, V.A.C.S. It was apparent from the accompanying map that the Burr Lot 458 is entirely surrounded by land of others, and the Court so held. It is equally apparent that the land in controversy is not so surrounded. The map shows that the east fence line of the Rogers pasture intersects Lots 436, 438 and 437, and that a small parcel of land in the northwest corner of Lot 436 is enclosed within the pasture and touches the east fence line; that a portion of Lot 438 is enclosed in the pasture and touches the east fence. The same is true as to Lot 437. Lot 459 is enclosed in said pasture and touches the west pasture fence line, being the fence which Casteel said he and his sons constructed.

Lots 436, 438, 437 and 459 are perimeter lots. Those parts of Lots 436, 438 and 437 lying east of the Rogers east pasture fence line, according to the evidence, were never within appellees' enclosure and were never claimed, and a disclaimer was filed thereto. All of the lots involved in this suit, except Lot 458 (the Burr lot) are either perimeter lots or contiguous to a perimeter lot. Therefore, Article 5511 is not applicable to the land claimed in Lots 436, 437, 438, 457 and 459. See Murray v. Slater, Tex.Civ. App., 274 S.W.2d 921. The cases cited by appellants are factually distinguishable from the instant case and inapplicable.

We sustain appellants' Point 6 that the Court erred in entering judgment for the north ½ of Lot 438 and the small tract in the northwest corner of Lot 436 against the defendants cited by publication, Chas. E. Wilson, Henry M. Eicher, Fannie Lambert Levenhardt and Benjamin Levenhardt and the unknown heirs of each of them. All other defendants appeared in person or by an attorney of their own selection. Plaintiff's affidavit for citation by publication merely states that the residences of each and all of the defendants are unknown to her. Rule 109, Texas Rules of Civil Procedure, provides in part:

"Where a party to a suit, his agent or attorney, shall make oath that the residence of any party defendant is unknown to affiant (and to such party where the affidavit is made by his agent or attorney) or that such defendant is a transient person, and that after due diligence such party and the affiant have been unable to locate the whereabouts of such defendant, * * * the clerk shall issue citation for such defendant for service by publication."

It is our view that the punctuation of the foregoing provision of Rule 109 clearly shows that the clause requiring due diligence applies where the residence of the defendant is unknown as well as where the defendant is a transient person. This view

is corroborated by the following provision in Rule 109:

"In such cases it shall be the duty of the court trying the case to inquire into the sufficiency of the *diligence exercised in attempting to ascertain the residence* or whereabouts of the defendant * * *" (emphasis supplied).

The record in this case is devoid of any evidence showing that any diligence whatever was exercised in attempting to ascertain the residence of the defendants or any of them. Although the judgment recites that the last named defendants have been served with citation by publication for the length of time and in the manner provided by law, there is nothing to show that the court inquired into the sufficiency of the diligence exercised in attempting to ascertain the residence of the defendants. Even if we assume that the court performed its duty and did so inquire, still the affidavit is wholly insufficient and defective. The cases cited by appellees involving collateral attacks upon judgments or bills of review are inapplicable.

■ The claim of appellees to the North ½ of Lot 438 and the small tract in Lot 436 against the publication defendants is severable from their claim against the other defendants involving the rest of the property. The judgment of the Trial Court as to said tracts may be reversed and remanded without reversing the judgment as to the other lots and the parties appearing in person or through their own attorney. Rule 434, T.R.C.P.; Tillman v. Mahaffey, Tex.Civ.App., 252 S.W.2d 255, ref., n. r. e.; Page v. Hancock, Tex.Civ. App., 200 S.W.2d 421, ref., n. r. e.; Durham v. Scrivener, Tex.Com.App., 270 S.W. 161.

■ In our opinion the Court did not err in refusing to permit Tacquard to testify further concerning the Hughes fence. In view of the lengthy testimony given by this witness concerning the fences, if there

was any error, it certainly was not such as was reasonably calculated to cause and probably did cause the rendition of an improper verdict and judgment. Rule 434, T.R.C.P.

That part of the judgment decreeing to appellees the North ½ of Lot 438 and the small tract in the northwest corner of Lot 436 is reversed and remanded, and the judgment otherwise is affirmed.

Affirmed in part and reversed and remanded in part.

COLEMAN, J., not sitting.