**Gus S. WORTHAM, Appellant,**

v.

**Harry G. NEVINS, Appellee.**

No. 14321.

Court of Civil Appeals of Texas.

Houston.

Oct. 22, 1964.

Vinson, Elkins, Weems & Searls, Dave NcNeill, Jr., Houston, for appellant.

Joel W. Cook, Houston, for appellee.

BELL, Chief Justice.

Appellee was the holder of record title to Lot 149 of Hahl's Suburban Farms Subdivision D located in Harris County. Appellant defended against appellee's trespass to try title suit by a plea that he and his predecessors in interest had acquired title under the 10 year statute of limitation. A jury was empanelled to hear the case but at the conclusion of the evidence the court, upon motion by the appellee, withdrew the case from the jury and rendered judgment for the appellee. The sole question for review is whether the trial court was in error in not submitting the issue of whether appellant and his predecessors in interest had satisfied the requirements of the 10 year statute of limitation.

Lot No. 149 contains 10 acres of land. On December 1, 1925, C. W. Hahl Company, through its president, C. W. Hahl, executed a contract of sale with Mrs. Mary Gibbs of Cook County, Illinois, under which it agreed to convey the property to Mrs. Gibbs upon her compliance with its terms. On November 24, 1931, the same company, through its same president, executed a general warranty deed to Mrs. Gibbs. During the years material to our inquiry, the lot was assessed for taxes in the name of Mrs. Gibbs by all taxing agencies and they were paid by her during her life and after her death were paid by her daughter, Mrs. Mary Gibbs Kerting, who had inherited the lot. Tax receipts in Mrs. Gibbs' name covering the years 1937–1951 were introduced by appellee. Mrs. Kerting died on August 17, 1952. Appellee inherited from her. No administration was ever taken out on Mrs. Kerting's estate. On March 8, 1950 Mrs. Kerting conveyed a right of way on the north 60 feet of the lot to the Harris County Flood Control District. These are the acts of ownership that Mrs. Gibbs and Mrs. Kerting asserted with respect to the land as shown by the record. Mrs. Kerting lived in California.

What use, if any, was made by anyone of Lot 149 prior to 1943 is not reflected.

On April 15, 1943, C. W. Hahl Company, through its president, C. W. Hahl, conveyed to M. B. Traweek several enumerated lots. We need only notice that among the lots conveyed by this general warranty deed were Numbers 152, 156 and the east part of Lot 160. Lots 152 and 156 each contain 10 acres and the east part of 160 contains 14.83 acres. The deed to these lots was filed for record April 29, 1943. We notice only these three lots because they were the only ones conveyed that lay within the barbwire enclosure that we will now notice.

At the time of this conveyance to Traweek there was a four-strand barbwire fence that enclosed various lots in the C. W. Hahl subdivision. The lots within the enclosure contained acreage aggregating approximately 220 acres. Who built the fence and for what purpose is unknown. The fence is described in the testimony as beginning at the southwest corner of Lot 160. This would be the southwest corner of the subdivision. It then ran along the south line of Lots 160 and 161 to the southeast corner of Lot 161. This last point would be in the west line of Addicks Road as shown on the plat of the subdivision. The road is referred to in the testimony as "Jack Rabbit Road." It then ran north to the northeast corner of Lot 141. It then ran west along the north lines of Lots 141, 149, 150, 156 and 157 to the northwest corner of 157. This last call takes the fence along the north line of the subdivision to its northwest corner. The fence then ran south along the west line of the subdivision to the place of beginning. While the location of the fence was thus given and as thus located would enclose about 220 acres, it appears from the testimony that Lots 153 and 161 were occupied and were also fenced on their north and west sides. These two lots together contain 41 acres so that the enclosure of these two lots by their north and west fence would leave about 180 acres enclosed by the outside fence that was not used other than by Mr. Traweek until he transferred possession. The witnesses referred to the acreage with-

in the enclosure as 200 acres but we have calculated it from the plat. The outside fence would cross two dedicated streets, Bryan Drive and Hockley Drive. These two streets run west from Addicks road to the west line of the subdivision. While they have been dedicated, they have not been opened or used as streets, according to the testimony.

Mr. Traweek testified that in January of 1943 he had bought 110 acres from a man named Crabby. It lay on Jack Rabbit Road and was south of the land enclosed. At one point he testified Crabby had been using it. He bought from Crabby in January, 1943. *He said at one point that he started claiming it after buying the other 110 acres from Crabby.* He testified that after buying from Crabby he recognized that Mr. Hahl owned some of the pasture in the enclosure to the north. He didn't know who owned the other land in the pasture. He went to Hahl and told him he wanted to buy what he owned in the pasture. Then followed the deed to the three lots mentioned. *At one point he stated he started claiming it when he bought from Crabby.* It is difficult for us to tell whether he was referring to land in the enclosure or the 110 acres south of the enclosure that he bought from Crabby. However, it seems to us any claim under Crabby is overcome by his voluntarily going to Hahl and wanting to purchase from Hahl whatever Hahl owned in the pasture. He did not know what Hahl owned, did not check to see what Hahl owned, and he did not testify he claimed whatever Hahl did not own. He was asked this question: "After you bought from Hahl you started claiming it?" *He answered: "I was using it."* (emphasis ours except where otherwise noted). He said Hahl had been using it. After he (Traweek) started using it he tore up part of the old fence and replaced it. He kept the fence repaired. He grazed about 250 head of range cattle in the pasture for the two years he kept and used it. He did nothing to show he was claiming the land. No one ever tried to put him off so there

was nothing to do. When asked if he knew he wasn't buying everything in the pasture, he stated he didn't know exactly—he knew how much and what he was buying but he had possession of the whole pasture. He stated he gave a warranty deed to V. C. Parish for some of it and gave a quitclaim to some of it. He did not know which part he gave a warranty deed for and which the quitclaim covered. Traweek was asked if he did not get deeds to other lots in the pasture from persons other than Hahl. He stated: "Seems I did—be guessing if I said I did or didn't."

On June 12, 1945, Mr. Traweek executed a quitclaim to V. C. Parish. The description given follows the line of the fence enclosing the pasture, but makes no mention of the fence. There is excepted from the transfer Lots 153 and 161. This quitclaim was not filed for record until June 15, 1950. The quitclaim makes no reference by number to any lots transferred. It includes within the boundary given Lot 149. Mr. Parish testified he got the 110 acres Traweek bought from Crabby and about 98 acres in the Hahl pasture by warranty deed from Traweek. It is of significance that while Traweek stated he did not remember whether he bought from others than Hahl, the warranty deed conveyed 98 acres though he bought only 35 from Hahl. He agreed to take everything under fence and got a quitclaim for all not covered by warranty deed.

We are unable to find from the record which lots in the pasture were covered by a warranty deed. Parish paid one price, $26,500.00 for all he got from Traweek, including that in the pasture. At the time nothing was said about title but Traweek just gave him a quitclaim to that under fence. Mr. Parish moved onto the 110 acre tract where Traweek lived. He operated a dairy. The quitclaim excepted Lots 153 and 161 because someone was living on them. He said he was claiming the other lots in the pasture. From the time he bought in June of 1945 until he sold in April, 1951, he used it for his dairy herd. He kept it mow-

ed and grazed his dairy cattle on it. He mowed it about twice a year. He stated that during all that time he claimed the land as his own. He ran from 200 to 225 head of cattle on it. It was always under fence capable of turning cattle—a 4 strand barbwire fence. He saw an ad in the paper from Mr. Traweek and he was looking for a dairy ranch, so he answered it. After he bought he was in continuous possession of the land until he sold to Mr. Peoples. He stated he was claiming everything in the fence. The quitclaim to Peoples, however, does not state he was claiming the land but merely states, after specifying the lots quitclaimed, that he has had them under fence and has *used* them continuously since June, 1945. In 1950 he gave a right of way deed to Harris County Flood Control District conveying a right of way on part of Lots 156, 157 and 159 and the 110 acre home tract. Lot 149 was not covered though the easement crossed it. He doesn't know why it was eliminated. The Flood Control District moved the north fence on the lots, including Lot 149, and he made no complaint. In about 1950 a Mr. Belz fenced Lots 141 and 142 that were within the fence. He said nothing about it and didn't try to interfere. Later Mr. Belz built on the tracts and he said nothing and did nothing. At the time Belz fenced he said nothing because he knew he had not held long enough to get a limitation title. Up to that time he had been claiming it. When building was started by Mr. Belz, he said nothing because he was in the process of selling. At one point in his testimony, when asked if he deliberately and on purpose clouded the title by taking the deed, he stated: *"No, I wanted it for pasture and had a chance to use it for pasture and I just used it."* He was then asked: *"You used it?"* He answered, *"Yes."* Then he was asked: *"Didn't plan to take it away from anybody?"* He answered: *"I didn't have that in mind because I didn't intend to keep it that long."*

Mr. Parish testified that he rendered everything in the enclosure for taxes. A later stipulation shows he did not render

it. He didn't remember that he did so each year but he did for some of the years from 1945 to 1951.

When Parish was called by the defense he stated that when he said he didn't intend to claim by limitation he was referring to the Belz tract. However he said that even as to it he was claiming it up to the time Belz started fencing it. He assumed when Traweek gave him a quitclaim that Traweek didn't have title. Parish used the land continuously from the time he got it.

In April, 1951, Parish and his wife executed to W. E. Peoples a quitclaim deed to Lots 145, 147, 148, 149, 150, 154 and 158. It was filed for record ten days later. The quitclaim recites that Parish has had the property under fence and has used it continuously since 1945. Peoples received a warranty deed as to other property. He got the quitclaim because he imagined Parish did not have record title. He knew Parish did not have record title to the lots covered by the quitclaim. He did not require Mr. Belz to move. He did not require the County to remove the north fence on Lot 149. He was asked if he just decided to try to take the land under the limitation statutes. He answered: "Yes, I was claiming it." He was then asked: "Trying to take it under the limitation statutes and that is all?" He answered, "Yes, sir." He didn't remember telling anyone he was claiming it. He did not think he rendered Lot 149 for taxes. He did not include Lot 149 in the inventory of property he filed with the "Tax Collector." He did render the property he got under the warranty deed. He didn't think it was necessary to render 149 or the other lots he got under quitclaim. He didn't pay taxes on 149. In October, 1960, he conveyed Lot 149 and the others he had gotten under quitclaim from Parish to appellant by a special warranty deed. He talked to Mr. Belz several times but never stated he claimed the lot (149) next to him. He didn't discuss the property. Nobody ever asked him if he was claiming the property. He has tried to and intended to take the full 70 acres described in the quitclaim

from Parish. He knew when he got the land he had just a quitclaim. He never talked to Mr. Wortham. Mr. Peoples pastured dairy cattle on the land after he got it April 30, 1951. At that time a Mr. Calvert, who had leased from Parish, had dairy cattle on it. Mr. Peoples bought his cattle and equipment. He bought 142 head of cattle. He continuously used the land to pasture cattle. Mr. Belz's land was not in his quitclaim. After he bought he gave up about 30 acres in the enclosure because he was sued for some of it. Some fellow came to him and claimed some of the property in the enclosure and when he showed he had better title Peoples got off. One of the tracts he was sued for he was paid about $500.00 for his claim.

After the sale to Mr. Wortham the land was used for grazing beef cattle and for growing hay.

According to a stipulation the rendition sheets of the Tax Assessor & Collector of Harris County from 1942 through 1952 show neither Parish nor Traweek ever rendered Lot 149 for taxes. The rendition sheet signed by Parish in 1950 was introduced as representative of each year's rendition sheets insofar as the statement of the taxpayer is concerned. It is worded, in part: "I do solemnly swear * * * the * * * inventory * * * contains a full, true and complete list of all taxable property owned or held by me in my own name for * * * in this County subject to taxation in this County * * *." It did not include Lot 149.

Mr. Belz testified about fencing Lots 141 and 142 and building on them in about 1951. Nobody stopped him when he began fencing. No one claimed to own the lots. He thought Mr. Peoples was running cattle in there when he bought—somebody was. He has talked to Mr. Peoples one time and Mr. Peoples just told him he had five and 10 acre tracts in the pasture. He did not say he owned the lot (149) next to Mr. Belz. Mr. Belz said he did not know Mr. Peoples was claiming Lot 149. He didn't

know Mr. Parish was claiming it. Since he bought and fenced his lots, cattle have been pastured on the land in the enclosure outside of his fence.

Suit was filed by appellee March·22, 1961.

Parish got his quitclaim June 12, 1945 and went into possession and continued until he executed his quitclaim to Peoples April 30, 1951. Peoples took possession and held it until he gave a special warranty deed to Mr. Wortham October 26, 1960. Mr. Wortham took possession on his purchase and has continued his possession. Mrs. Kerting, the owner, died August 17, 1952. No administration was ever taken out on her estate. For one year following her death the running of the statute was suspended. The result is that, assuming the requisites of the statute of limitation, apart from length of time, were met by Mr. Peoples and Mr. Wortham, for title by limitation to have matured prior to filing of suit, part of Mr. Parish's occupancy must be relied on by appellant.

To establish title by limitation the possession of the claimant must be adverse, that is, there must be an actual and visible appropriation of the land commenced and continued under a claim of right inconsistent and hostile to the claim of another. Article 5515, Vernon's Ann.Tex. Civ.St. Claim of right means that the entry by the claimant must be to claim the land as his own, to hold it for himself, and such must continue to be the nature of his possession. Claim of right is an essential element of adverse possession. The intention of the claimant to hold it for himself must be manifested by open or visible acts or declarations showing such purpose. Houston Oil Company v. Jones, 109 Tex. 89, 198 S.W. 290; Orsborn v. Deep Rock Oil Co., 153 Tex. 281, 267 S. W.2d 781, and numerous authorities there cited in both the majority and dissenting opinions. If there is no verbal assertion of a claim of right to the land brought to the knowledge of the owner, the adverse possession must be so open and notorious

and manifested by such open and visible acts that knowledge on the part of the owner will be presumed. Orsborn v. Deep Rock Oil Co., supra.

■ We are of the view that the evidence in this case fails to raise a jury issue, but to the contrary the evidence as a matter of law shows the possession of Traweek and Parish was not hostile to the true owner.

· Here under the evidence the fencing was purely casual. It is undisputedly shown that neither Traweek nor Parish built the fence. The record affirmatively shows no one knew who built the fence or for what purpose. Traweek did testify he replaced part of the fence that was old and maintained the fence. However, when the old part was replaced and how extensive the replacement was is not shown. Traweek and Parish testified to the conclusion that they maintained the fence but no testimony shows what they did which they concluded amounted to maintenance. The significance of fencing by the alleged claimant is that the act itself is such as to evidence an assertion of the claim of ownership. It is true that casual fencing in some cases will not destroy the adverseness of a claim if there is evidence of other acts of dominion that are sufficient of themselves to show adverseness. However, casual fencing will not aid other acts that are not of themselves sufficient to evidence an adverse claim. Orsborn v. Deep Rock Oil Company, supra.

Here Traweek and Parish merely grazed cattle on the entire pasture. Lot 149 was a 10 acre tract in the extreme north end of a pasture of about 180 acres. Traweek grazed about 250 head and Parish later grazed about 200 head. There is no evidence as to the physical characteristics of Lot 149 and the record fails to affirmatively show that cattle grazed on Lot 149. We are left to surmise that they did. Too, in the same enclosure were several tracts, the record title to which was in Traweek and Parish. Entry was presumptively made so far as the owner of Lot 149 was concerned under title to these lots and the grazing of the cattle was referable to these lots and the grazing, if any, on Lot 149 would be a casual straying of the cattle from the lots owned by Traweek and Parish. The land enclosed was mowed only about twice a year. These acts were not sufficient of themselves to evidence adverseness of possession. Orsborn v. Deep Rock Oil Company, supra; West Production Company v. Kahanek, 132 Tex. 153, 121 S.W.2d 328, opinion approved.

Closely related to the principle of incidental or casual enclosure is the question of the presence of the essential claim or claim of right. No matter how exclusive and hostile to the true owner the possession may be in appearance, it cannot be adverse unless accompanied by the intent on the part of the occupant to make it so. Naked possession unaccompanied with any claim of right will never constitute a bar. This claim of right must be manifested by declaration or by open or visible act. If there is no verbal assertion of claim brought to the knowledge of the owner, the possession must be so open and notorious and manifested by such open and visible act or acts that knowledge on the part of the owner will be presumed. Orsborn v. Deep Rock Oil Company, supra.

Here the evidence affirmatively shows that Traweek and Parish never made any verbal assertion of a claim of ownership. Traweek, in his testimony in court, faintly said he was claiming the land. This, as the court in the Orsborn case said, is testimony about a mental process or the expression of a mere opinion or conclusion. The claim of right must be more than a mental process; there must be external circumstances discovering that inward intent. Here Traweek, after stating he claimed the land after buying the 110 acres from Crabby, testified he immediately went to Hahl and told him he wanted to buy whatever Hahl owned in the pasture. This, particularly when coupled with the absence of testimony from Traweek that he was

nevertheless claiming whatever Hahl did not own, is an overt act showing the absence of a claim of right that overcomes any expression of an inward intent. Too, Traweek never paid any taxes on the lot and did not render it for taxation. When specifically asked if he started claiming after he bought from Hahl, he answered, "I was using it."

Traweek executed a quitclaim to Parish. Parish testified he was claiming the land though he also testified he didn't intend to get it by limitation because he didn't intend to keep it that long. This is, of course, only testimony as to a mental process. He also testified he never told anyone he was claiming it; that there was no occasion for him to do so. However, there were at least two occasions when his possession of land within the enclosure was challenged and he sat by and made no assertion of the claim. In March of 1950 he conveyed a 60 foot right of way to Harris County Flood Control District off of the north of Lots 156 and 157 that were west of Lot 149 and in the same enclosure. The deed did not include the north 60 feet of Lot 149 though the same project crossed the north 60 feet of Lot 149 and Parish made no complaint that the deed did not cover Lot 149. Also as a part of the same project Parish gave a deed to 30 feet off of the west side of Lot 159. Parish had record title to these lots. Not only this, but Parish made no claim for any part of the money paid Mrs. Kerting by Harris County Flood Control District for the 60 foot right of way she conveyed off of Lot 149. Following the execution of the deeds the Harris County Flood Control District entered into possession under Mrs. Kerting for the purpose of improving drainage facilities on the north 60 feet of the right of way across Lot 149 and also moved the fence and relocated it at the southern terminus of the right of way, and Parish stood by and said nothing and did nothing. These were acts which invaded the possession of Parish by a person claiming under someone other than Parish that would

naturally call for some affirmative action by him. Yet he took none. Too, while Parish testified he rendered Lot 149 for taxes at least for some of the years, it was stipulated by his counsel that he had not. A 1950 rendition sheet signed by Parish on which neither Lot 149 nor other lots covered by the quitclaim from Traweek were listed was introduced. The evidence shows without dispute that the record title owner paid the taxes each year. It should also be noticed that Parish testified he was claiming all lots in the enclosure. Too, he testified, when asked if he deliberately clouded title: "No, I wanted it for pasture and had a chance to use it and I just used it." His testimony as to his mental process of claiming reflected the same intent with regard to all lots. Nothing is shown that would indicate any different claim as to any particular lot. We think this is significant because Lots 141 and 142 belonging to a Mr. Belz were also in the enclosure. No different use is shown of these two lots than was made of Lot 149. In 1950 Mr. Belz fenced the two lots. Parish saw him doing it and did nothing and said nothing. Then, when just before Parish sold to Peoples in 1951, Parish saw Belz building on the lots and he said nothing. We think, though this involved lots other than Lot 149, that Parish's attitude as to any lot in the same enclosure is material in reflecting his intent as to all the lots to which he did not hold record title that lay within the enclosure.

The Harris County Flood Control District, through its contractor, excavated in providing drainage facilities on the easement. This entry was under a right of way deed from the record title holder of Lot 149. Too, the District moved the fence on the north line of the lot to the south line of the easement. The deed from Mrs. Kerting was filed for record May 30, 1950 in the Harris County Deed Records. It also provided that the District shall have the right to place excavated material on the lot adjacent to but outside of the 60 foot easement. When the representatives

**474**

of the District thus entered into possession of a part of Lot 149 under the owner, Parish made no protest and asserted no claim. The claimants had never improved the lot and were not in actual possession except as it might be inferred that cattle possibly casually grazed on it. This entry by representatives of the owner and the absence of any protest by Parish establishes there was not that hostile possession under an unmistakable claim of exclusive ownership which is required. Rick v. Grubbs et al., 147 Tex. 267, 214 S.W.2d 925.

The judgment of the trial court is affirmed.