M. McDONNOLD, Jr. et al., Appellants,

v.

Charles WEINACHT et al., Appellees.

No. 6037.

Court of Civil Appeals of Texas.

El Paso.

Oct. 1, 1969.

Rehearing Denied Oct. 29, 1969.

Maurice R. Bullock, M. McDonnold, Jr., Midland, for appellants.

W. B. Browder, Jr., Midland, for appellees; Stubbeman, McRae, Sealy & Laughlin, Midland, of counsel.

## OPINION

WARD, Justice.

This suit was brought by appellants as record title holders of a 160-acre tract of land, against appellees, who defended on title by adverse possession under the ten-year statute of limitations. Trial was had before a jury, and the jury found that the appellees had held peaceable and adverse possession of the property, using or enjoying the same for a period of ten years or longer prior to January 9, 1964, the date of the filing of the suit. The trial court entered a take-nothing judgment on the verdict, thereby divesting title to said land from the record owners and awarding it to the limitation claimants. The land in controversy is described as the Northwest Quarter (NW¼) of Section 39, Block 13, H & GN Ry. Co. Survey, Reeves County, Texas, containing 160 acres more or less, as shown by a plat of the land introduced into evidence by the appellants and adopted by the appellees as a correct portrayal of the ground situation, a copy of which is attached to this opinion.

Plat "A"

[A143]

By appropriate assignments of error the appellants claim that there is no evidence of probative force to support the findings of the jury; that the evidence is insufficient to support such finding; and that the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong, all as to the necessary elements of "adverse possession", "claim of right", and "continuous use of the land". We will, of course, follow the familiar rules for appellate determination of such assignments by first disposing of the law question of "no evidence" before passing on the fact question of the "sufficiency of the evidence" as to the necessary elements above referred to; and as to each, we will first, on the law question, consider only the evidence favorable to the finding, which we will sustain if there is evidence of probative force to support it. On the fact questions, we will consider and weigh all of the evidence in the case to determine whether there is a sufficiency

of evidence to support each of the respective findings. It becomes necessary to review in detail the evidence in the case to determine the questions presented.

In 1940, L. A. Weinacht purchased the Meir ranch, which contained some 3523 acres of land lying to the west, northwest, and north of Section 39, and including the Sections 36, 35 and 40 as shown by the plat. In preparation for moving his horses and cattle on to the ranch, Mr. L. A. Weinacht found that the Meir ranch was completely enclosed by a fence which was in need of repairs. In the year 1941 he repaired all fences completely, and in particular the one-mile long fence separating Sections 39 and 36, as it was practically down. That at the time he purchased the ranch, he found that the disputed Northwest Quarter of Section 39 was enclosed by a wire fence, also on its east side, which fence from the southeast corner of said quarter section, angled in a southeast direction to the south boundary of Section 39 to a fence on the south boundary of Section 39 that ran along the south boundary, west to his deeded Section 36. This is shown by the plat with the "X's" representing the fences. That the fence along the south boundary of Section 39 was in bad repair and practically down in places. That by agreement with his grantors, who he thought controlled the Southwest Quarter of Section 39, he repaired all the fences surrounding the West Half of Section 39 including the portion lying across the Southeast Quarter of Section 39, as shown on the plat, and thus had enclosed a total of about 400 acres. That the above fences, after repair, were four-strand wire, posts every thirty feet, with three stays between the posts, and would all turn cattle and horses. That these fences were maintained and repaired annually from 1941 until in July and August of 1954, when a new fence was constructed by the appellees from the Southeast corner of the disputed tract directly south to the south line of Section 39, and also at which time the fence between Sections 39 and 36 and along North line of the disputed tract was re-moved so that the entire western one-half of Section 39 was opened to the main ranch pasture of the appellees and thereafter used as a part of the main pasture. At the time, in 1941, when he initially repaired the preexisting fences, L. A. Weinacht also made a lane to a windmill and "big water lot" located in the southeast corner of the deeded Section 36. A water trough ran under a fence which divided the water lots so that animals from both L. A. Weinacht's deeded lands and the 400-acre tract could drink while remaining separated. There was a wire-gap gate between the southwest corner of Section 39 and such water lot, but, at least after 1943, it was never closed except to catch an animal. As to the fences in existence in 1941, the record is silent as to when, by whom and for what purpose such fences had been constructed.

When Mr. Weinacht went into possession of his deeded ranch, he took use of the said 400 acres because he at first had an agreement from his grantors that he could use the Southwest Quarter of Section 39, and thereafter testified he had this portion under oral leases until the time of the present suit. He never, at any time, asserted any claim to this Southwest Quarter section or to that part of the 400-acre tract that was on the Southeast Quarter of Section 39. However, he did claim the disputed Northwest Quarter of Section 39 from 1941 until he deeded the disputed land to his two sons, Charles and Don Weinacht, in March of 1963. They, in turn, claimed the land to the time of the institution of the present suit.

As to the use of the property, the appellees proved that on the ranch they kept, at all times from the time of its purchase, some eight or ten brood mares and horses and some 80 to 100 cattle. That the 400-acre enclosure from 1941, annually, until the summer of 1954 was used primarily as a trap, to keep his horses and also cattle that had worms or calves that had worms, so that it was easier to get to them to doctor them. Once or twice each year

the trap was used to gather and deliver cattle. After the summer of 1954, when the fence between Sections 39 and 36 and also along the north line of the disputed tract was removed, it was just a part of the regular ranch. Beginning in 1943, annually, the 400-acre trap was chopped with hoes by employees of the appellees to clean it of cockle burrs and ink weed. The removal of the cockle burrs was done because "they are bad on horses and cows as they get in their tails and manes" and the removal of the ink weed was because it was poisonous and "it takes only a few hands full to kill a cow." According to the appellees, in the year 1960 they constructed a large tank approximately in the middle of the disputed tract to catch water for their stock. On the plat this is depicted by the "U". This portion was disputed by testimony of the appellants that the tank was not constructed until the year 1964. The only suitable use of the property, during the whole period of time until shortly before the institution of the suit, was for ranching. It now appears that proposed Interstate Highway 10 will cross the north part of the disputed tract, together with a Farm to Market highway along the east line and with an interchange proposed at the intersection of the two highways.

As to state, county and school taxes on the disputed tract, apparently none were paid by anyone from the year 1927 until 1962, when Mr. Weinacht started paying them. On February 25, 1963 appellant M. McDonnold, Jr. paid these back taxes in the amount of $291.92 after securing oil and gas leases on the tract from the other record title holders on February 23, 1963.

Appellants submit that Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781 (1954) controls the disposition of this case. We think not, as in the case before us there were facts of such weight presented to the jury for its determination as to preclude the appellants' recovery now either as a matter of law or to require a remand because of the insufficiency of the evidence. This is typical dry, flat, open Trans-Pecos country, with little vegetation on it, as clearly depicted by the aerial photographs in evidence. Any improvements or any use of the property would be wide-open for inspection.

The Orsborn case clearly states the general rule as follows:

"It is settled that limitation title cannot be acquired by grazing unenclosed land. * * * And it is of course true that title cannot be acquired merely by fencing land without grazing it or farming it or putting it to other use. When the use relied upon to support the statute is grazing, there must be also at the same time sufficient enclosure, such as to give evidence that the land was designedly enclosed and to show the assertion of claim hostile to the true owner. * * * The ordinary case for the acquisition of title by adverse possession, when the use is grazing, is one in which the person claiming title under the statute has built a fence or fences enclosing the land and has maintained the enclosure and continuously used the land for grazing during the statutory period. Such construction of fences and use of the land for grazing afford evidence of hostile claim."

The court went on to decide that the facts in the Orsborn case take it out of that general rule and bring it within the exception to the rule:

" * * * that when the disputed tract of land has been casually or incidentally enclosed with other land, especially when, as here, such other land is held by the possessor under deed, the incidental enclosure and the occasional grazing of the disputed tract by cattle straying from the titled land will not amount to such adverse and hostile possession and use as will support the statute of limitations. Harmon v. Overton Refining Co., 130 Tex. 365, 109 S.W.2d 457, 110 S.W.2d 555; West Production Co. v. Kahanek, 132 Tex. 153, 121 S.W.2d 328; McKee v. Stewart, 139 Tex. 260, 162 S.W.2d 948;

Primitive Baptist Church [etc.] v. Fla.-Tex. Corp., Tex.Civ.App., 158 S.W.2d 549."

The distinguishing feature in the case before us is that the disputled tract, from 1941 to 1954 and from 1954 to 1964, was never casually or incidentally enclosed as that term is described in the Orsborn case and in the cited cases above. From 1941 until 1954, the disputed tract was separately enclosed from the deeded land by a distinct fence and, as stated, at the time of the purchase of the deeded land, the fence that bounded Section 39 on the west and south, was practically all down. This portion was definitely rebuilt. When the fence on the west side of Section 39 and the north side of the disputed tract was torn down in the summer of 1954, the new fence, one-half mile in length, was constructed from the southeast corner of the disputed tract to the south boundary of Section 39. In the first period of time it cannot, in any way, be stated that L. A. Weinacht went into a possession which was referable to his deed as the disputed tract was entirely separated from his deeded land by a fence at least one mile long, which he did rebuild. It is true that the disputed tract was enclosed with unclaimed lands a portion of which appellees thought they had permission to use, but they knew definitely, at the original entry, that the disputed 160 acres was not theirs, and they used it by the only means that the land could afford. The fence rebuilt, repaired and maintained by Mr. Weinacht and his two sons, prevented access to cows and horses from his deeded land to the disputed land. The possession of the appellees was open, hostile and obvious to the appellants and all others. In 1954, when the one and a half mile fence was torn down, and the new one-half mile fence was built so as to open the west half of Section 39 into the general pasture of the ranch, this was certainly a deliberate and obvious enclosure, and not a casual or incidental enclosure at that time, of the disputed property with the deeded lands. This new arrangement again made the possession of the appellees open, hostile and obvious to the appellants and all others.

In the two time periods discussed, the fact that there was additional land enclosed as to which the appellees made no claim while important, is not controlling. It was a matter to be considered by the jury and the jury having favored the appellees, it was a matter which was in their province as exclusive judges of the facts proved, the credibility of the witnesses and the weight to be given to the testimony. Lone Star Steel Company v. Owens, Tex.Civ.App., 302 S.W.2d 213 (err. ref., n. r. e.); Houston Oil Co. of Texas v. Skeeler, Tex.Civ.App., 178 S.W.2d 740 (wr. ref., n. r. e.).

As to claim of right, we again have the familiar fact situation where there was no verbal or written assertion of claim to the land brought to the attention of the title owner. Here, of course, the rule as to this necessary element is that the adverse possession must be so open and notorious, and manifested by such open or visible act or acts, that knowledge on the part of the owner will be presumed. Orsborn v. Deep Rock Oil Corp., supra; Dingman v. Spengler, Tex.Civ.App., 371 S.W.2d 416 (err. ref., n. r. e.). This court had the same problem before it in the recent case of Butler v. Hanson, 432 S.W.2d 559, which is now pending in our Supreme Court. There the limitation claimant's contention was sustained and we distinguished the facts there from the Orsborn and Dingman cases. Again without repeating what we have said, we feel that the facts in the present case at least make an issue upon which the jury was the final judge, and that its verdict must be sustained.

Appellants introduced into evidence a letter written by L. A. Weinacht on August 5, 1952, by which he sought to obtain a grazing or grass lease on the land in controversy from B. A. Campbell and Delbert

Loos. Neither of such parties was shown to then own the record title to the land in controversy, but Delbert Loos was shown to be one of the possible owners of the Southwest Quarter of Section 39, which at all pertinent times has been within the same enclosure as the land in controversy. Appellants most earnestly assert that this letter, at that time, compels the finding that he was not then claiming the land in controversy, and that the appellees failed to meet their burden of proving that L. A. Weinacht thereafter changed his intentions toward such land, unless the same was manifested by his fence changes in the summer of 1954, his construction of the watering tank in 1960, and the other acts referred to shortly before the present suit was filed, which dates are all less than ten years prior to the filing of this suit. Appellants cite the cases of Wortham v. Nevins, Tex.Civ.App., 383 S.W.2d 467 (Houston 1964, no writ), and Allison v. Groppenbacher, Tex.Civ. App,. 142 S.W.2d 528 (El Paso 1940, wr. ref.). As we understand the Wortham case, the declaration there was one of many positive acts of the claimant showing that he was asserting no claim to the land. In our Groppenbacher case we had before us a situation where the adverse possession was not so open and notorious and manifested by such open or visible act or acts that the claim of right on the part of the owner would be presumed. More important, however, the letter in the Groppenbacher case was written directly to the attorney then representing the record title holder in regard to the land. In the present case, there is no recitation in the letter which can be construed as a recognition of the title of the appellants. The appellees had no dealings with the appellants, and their relation was that of strangers to each other. The letter was one of the facts proven in the case, but is not controlling.

In regard to the continuous use of the land, we have considered the particular location of this land and the fact that the appellees appropriated the land to the one purpose for which it was adapted.

" * * * it is evident that in determining what will amount to an actual possession of land, considerable importance must be attached to its nature and to the uses to which it can be applied, or to which the claimant may choose to apply it. What is adverse possession is one thing in a populous country, another thing in a sparsely settled one, and still a different thing in a town or village. * * * The governing questions of law, regardless of the character of the premises, are the same in every case, but the question of fact may be presented by evidence in a great variety of ways, according to the circumstances. As a general rule it will be sufficient if the land is so used by the adverse claimant as to apprise the community in its locality that it is in his exclusive use and enjoyment, and to put the owner on inquiry as to the nature and extent of the invasion of his rights; and this is especially true where the property is so situated as not to admit of permanent improvement. In such cases, if the possession comports with the usual management of similar lands by their owners, it will be sufficient."

1 Am.Jur. 866, Adverse Possession, § 131. To the same effect, see Heard v. State, 146 Tex. 139, 204 S.W.2d 344. And we might add that what is adverse possession in a populous country is still another thing in the Trans-Pecos area of the present land. We feel that it is merely a fact issue that was decided by the tryer of facts contrary to the position of the appellants, and that there is evidence in the record sufficient to sustain the finding.

All of the points of the appellants having been duly considered, they are all overruled and the judgment of the trial court is affirmed.

FRASER, C. J., and PRESLAR, J., concur.