M. McDONNOLD, Jr., et al., Petitioners,

v.

Charles WEINACHT et al., Respondents.

No. B–1852.

Supreme Court of Texas.

March 10, 1971.

Rehearing Denied April 21, 1971.

M. McDonnold, Jr., Maurice R. Bullock, Midland, for petitioners.

Stubbeman, McRae, Sealy & Laughlin, W. B. Browder, Jr., Midland, for respondents.

WALKER, Justice.

M. McDonnold, Jr. et al brought this trespass to try title suit against L. A. Weinacht et al to recover title to and possession of the NW/4 of Section 39, Block 13, H. & G. N. Ry. Co. Survey in Reeves County. Plaintiffs are the record owners, and defendants claim title under the ten-year statute of limitations. Art. 5510, Vernon's Ann.Civ.Stat. The trial court rendered judgment on the verdict in defendants' favor, and the Court of Civil Appeals affirmed. 446 S.W.2d 37. In our opinion there is no evidence to support the finding of the jury that defendants held adverse possession of the land for ten years.

If defendants have title by adverse possession, it must be through use of the land by L. A. Weinacht, hereinafter referred to as Weinacht. His two sons, to whom Weinacht conveyed the disputed tract in 1963, will be referred to by their given names, Charles and Don. The present suit was filed on January 9, 1964. In the summer of 1954, there were changes in the fences so that the land in controversy became part of a different enclosure. Since this occurred less than ten years prior to the institution of this suit, we will confine our statement of the facts to the situation as it existed from 1940 to 1954. Our treatment of the case in this manner is not to be taken as indicating approval of the holding by the Court of Civil Appeals that defendants were in adverse possession of the disputed tract after the fences were changed in 1954. We simply do not reach that question.

The tract in controversy contains 160 acres. Its eastern and southern boundaries are indicated by broken lines on the following plat:

[See following illustration]

[A3709]

The foregoing plat is a reproduction of Plaintiffs' Exhibit 41 with the following changes made by us: (1) addition of a legible letter "G" at the southeast corner of Section 39; (2) addition of words and symbols indicating the location of adjacent deeded land owned by Weinacht in Sections 35, 36 and 40; (3) elimination of markings indicating a fence from D to B that was built by Weinacht in 1954, less than ten years prior to institution of this suit; and (4) addition of X's made with a typewriter and indicating Weinacht's boundary fences on the south line of Section 36, the east line of Section 40, and from A to the southeast corner of Section 40. The location of all other fences was marked by Don with pen and ink on Plain-

tiffs' Exhibit 41 during the trial, and defendants adopted the exhibit as a correct portrayal of the ground situation.

Weinacht acquired the Meier Ranch from Mrs. Mary J. Gould et al. by deeds dated November 15, 1940. This ranch consists of five and one-half sections, including Sections 35, 36 and 40, and contains about 3523 acres. It was completely surrounded by fences. No part of Section 39 was included in the deeds to Weinacht. The fences in and around Section 39 at that time, and as they continued to exist until 1954, are depicted by X's marked by Don on the above plat. The land in controversy was thus in an enclosure of about 400 acres, hereinafter referred to as the trap, that included the NW/4, the SW/4 about half of the SE/4, and apparently a strip off the west side of the NE/4, of Section 39. The record is silent as to when, by whom or for what purpose any of the fences were originally built.

Weinacht knew that the land in controversy was not included in his deed. Mrs. Gould advised him that she had the SW/4 of Section 39 under lease, however, and she told him to go ahead and use it. He paid pasture rent on the SW/4 to Mrs. Gould every year from 1943 to 1949, and he continued to hold the same under Mr. Gould after her death. From 1958 until the time of trial, he held the SW/4 under lease from and paid pasture rent to Delbert Loos et al. who were then the record owners.

Shortly after acquiring the Meier Ranch in 1940, Weinacht repaired all of the fences around his deeded land. These included the fence on the east line of his Section 36 and the south line of his Section 40, which incidentally were the fences bounding the trap on the west and north. He also repaired the fences bounding the trap on the south and east. All of the evidence concerning repairs made at that time comes from Weinacht, whose testimony is inconsistent in several respects and far from clear on a number of points. According to Weinacht's testimony, he found that the fences around his deeded land and around the trap "were all up pretty good" except those on the west and south lines of Section 39. The two last mentioned fences were "practically down in places." Posts that were broken off or rotted in the west fence were replaced, and all of the wire in this fence was re-stretched. As for the south fence, "it was up in pretty good shape—nothing excellent. We repaired it all." Later he stated that he "rebuilt that [from F to B] as a real fence right after I got the thing." "We also rebuilt that fence" from E to A, but the nature and extent of the work done on the north and south fences is not disclosed by the evidence. The east fence extending from A to D to G "wasn't too good a fence." He "repaired it"; "we didn't build too good a fence on that part right there, but it would turn horses and cattle." It seems fairly clear then that Weinacht made substantial repairs to at least part of the fences surrounding the trap, but there is no evidence that he changed their location or character or built any new fences. After doing his initial work, Weinacht continued to maintain the fences in repair from 1941 to 1954.

There was a lane leading from the SW/4 of Section 39 at its southwest corner to a large watering lot in the southeast portion of Weinacht's deeded Section 36. Cattle grazing on the large pasture on the deeded ranch also had access to the watering lot, but the fences were so arranged that cattle in the main pasture could not enter the trap. There were watering troughs and a windmill in the lot, and salt for livestock in the trap was placed there. Weinacht kept horses and brood mares in the trap, and used it to hold wormy cattle and calves, continuously from 1941 to 1954. Once or twice each year during that period, the trap was used for gathering and holding cattle that were to be sold. Each year Weinacht and his employees chopped

the cockleburs and inkweed growing on the 400 acres. This was done because the burs "are bad on horses and cows—get in their tails and manes." The inkweed is very poisonous—"it just takes a few hands full to kill a cow."

Weinacht did not ever claim the SW/4 or the portion of the SE/4 that was in the trap. According to his testimony, he did claim the NW/4 of Section 39 continuously from 1941 until it was conveyed to his two sons in 1963. However, he guarded his claim carefully. Until about three years before the institution of this suit, he never gave written or verbal expression to the claim except to members of his immediate family. The only testimony that he claimed the disputed tract came from Weinacht and his two sons. They testified that he claimed the land but not that he ever told anyone of his claim. His neighbor and kinsman who held a lease on the NE/4 of Section 39 never heard Weinacht or any of his family make claim to any part of the NW/4. This was also true of the County Surveyor who had been surveying land in the area for 20 years and who, in 1963, surveyed the right of way for Interstate Highway 10 across the Weinacht Ranch.

The claim was also kept secret from the taxing authorities until 1961. Weinacht's state and county rendition sheet for 1960 was offered in evidence, and he admitted that he signed and swore to the rendition. The oath he took was in the usual form that "this inventory rendered by me contains a full, true and complete list of all taxable property owned or held by me * * * in this county." The NW/4 of Section 39 was not listed, although the rendition did include one acre owned by Weinacht in the northeast corner of the same section. It was stipulated that, in so far as material to this suit, all of his state and county rendition sheets for prior years were similar to the 1960 rendition. No taxes were paid by Weinacht on the NW¼ of Section 39 for those years.

On August 5, 1952, Weinacht wrote a letter to two individuals at Quincy, Illinois. In this letter he stated that his map indicated that the addressees "own the NW/4 of Section 39, Block 13, in Reeves County." The letter further stated that he "would like to get a grazing or grass lease on this 160 acres" and would "give ten cents per acre for a one or three year grass lease." Weinacht admitted writing this letter which, if received by the true owner, was calculated to induce the belief that the writer was not claiming to own the land himself.

If plaintiffs had suspected an adverse claim and made inquiry of Weinacht, it is not at all certain that he would have told them that he was claiming the land. His own testimony shows that he was somewhat less than open and frank with plaintiff McDonnold, who first became interested in the disputed tract when he obtained oil and gas leases from the record owners in 1963. Later that year he visited Weinacht for the purpose of attempting to buy mineral royalty interests in the latter's ranch. In the course of the conversation, McDonnold showed Weinacht a map on which the land in dispute had been colored in purple. Weinacht inquired why the tract was colored, and McDonnold replied that he had obtained an oil and gas lease from the record owners and was on his way to pay the delinquent taxes. Weinacht did not then advise either that he was claiming the land or that he had been paying the taxes since 1961. Upon paying the delinquent taxes, McDonnold learned that Weinacht had paid the taxes for several years. He again visited Weinacht and offered to refund the taxes paid by the latter. According to McDonnold's testimony, and his only explanation of this continued Weinacht stated, "that won't be necessary; I have had some use of the land." Weinacht admitted that he said nothing to McDonnold about claiming to own the land, and his only explanation of this continued

secrecy was that "I don't never tell all of my business to everybody."[1]

■ There is good reason then for the rule that to constitute adverse possession under the ten-year statute, the appropriation of the land must be of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant. See Heard v. State, 146 Tex. 139, 204 S.W.2d 344; Satterwhite v. Rosser, 61 Tex. 166. Defendants here rely, as they must, upon the grazing of livestock, chopping weeds, and repair of existing fences. The tract in controversy was never separately enclosed, and no one has ever resided upon or cultivated the land in the trap. During the 1940–1954 period, there was no improvement of any kind on the 400 acres, not even a watering trough or salt box or improved road. The closest semblance to a road on the NW/4 was a trail made by driving vehicles and extending from the gate at the southwest corner of the 400 acres to a point just across the south line of the land in controversy. "It didn't go anywhere. It just went out in the pasture."

■ Our courts have never recognized the common law rule of England that requires every man to restrain his cattle either by tethering or by enclosure. Unenclosed land has always been regarded as commons for grazing livestock in Texas, and it is well settled that the use of unenclosed land for grazing livestock does not, of itself, constitute adverse possession. Fuentes v. McDonald, 85 Tex. 132, 20 S. W. 43. A claimant who builds and maintains fences for the purpose of enclosing the land and grazes the same continuously may be in adverse possession, but not every enclosure capable of turning livestock will suffice.

■ Part of the unenclosed commons might become enclosed as a result of being fenced out by surrounding owners. The grazing of an enclosure thus "casually" or "incidentally" created has never been regarded as an actual and visible appropriation of the land within the meaning of Article 5515, Vernon's Ann.Civ.Stat. In the absence of special stock laws, an owner who does not properly fence his property has no cause of action for damage done by cattle of ordinary disposition that enter the land. Clarendon Land Investment & Agency Co. v. McClelland, 86 Tex. 179, 23 S.W. 576. If the owner of land enclosed with that of another wishes to prevent the latter's livestock from grazing on his property, his remedy is to construct a suitable fence for that purpose. Pace v. Potter, 85 Tex. 473, 22 S.W. 300. It would be rather strange then to hold that a person might acquire limitation title by simply doing that which he is legally entitled to do, i. e. permit his livestock to wander and graze upon land that he happened to find enclosed with his own deeded or leased land.

■ It is accordingly well settled that the mere grazing of land incidentally en-

---

1. Weinacht testified on cross-examination as follows:

Q Did you tell him you didn't claim it or didn't own it?
A I didn't tell him yes or no.
* * * * *
Q You never did tell any of these land owners or Mr. McDonnold or anybody else that you claimed that land up until the time you filed that deed to your boys, did you?
A I don't never tell all of my business to everybody.
* * * * *
Q In other words, you were going to wait until he drilled a well or something before you told Mr. McDonnold?
A I would have waited until he started, yes, sir.

Q And let him go ahead and spend any amount of money he could spend on it ˄ and then tell him, is that what you intended to do?
A That would have been his business.
Q And you then deliberately did not tell him because you just wanted to wait and see what he would do with that land, is that right?
A Why, absolutely.
* * * * *
Q Why did you not tell him at that time that you claimed this land? Wasn't that the most natural thing in the world to do?
A I don't see why.

closed as a result of the construction of fences built for another purpose does not constitute possession that will ripen into title by limitation. The adverse claimant who relies upon grazing only as evidence of his adverse use and enjoyment must show as part of his case that the land in dispute was designedly enclosed. Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781; McKee v. Steward, 139 Tex. 260, 162 S.W.2d 948; West Production Co. v. Kahanek, 132 Tex. 153, 121 S.W.2d 328; Harmon v. Overton Refining Co., 130 Tex. 365, 109 S.W.2d 457, 110 S.W.2d 555; White v. Daniel, Tex.Civ.App., 391 S.W.2d 176 (wr.ref. n. r. e.); Dingman v. Spengler, Tex.Civ.App., 371 S.W.2d 416 (wr. ref. n. r. e.); Rickel v. Manning, Tex.Civ. App., 369 S.W.2d 655 (wr.ref. n. r. e.); Wynn v. Mendoza, Tex.Civ.App., 287 S. W.2d 217 (wr.ref. n. r. e.); Primitive Baptist Church at Fellowship v. Fla-Tex Corp., Tex.Civ.App., 158 S.W.2d 549 (wr. ref. w. m.); Vineyard v. Brundrett, 17 Tex.Civ.App 42, 42 S.W. 232 (wr.ref.); Delany v. Padgett, 5th Cir., 193 F.2d 806.

The land in Vineyard v. Brundrett, 17 Tex.Civ.App. 42, 42 S.W. 232 (wr.ref.), was bounded on three sides by three bays. On the fourth side was a fence erected by adjoining owners for the purpose of enclosing their land, and the adverse claimant agreed with these owners to keep the fence in repair. The land he claimed was used only for grazing purposes. In holding that the evidence was legally insufficient to show adverse possession, the court said:

> The inclosure was not such as to show the assertion by any one of a claim hostile to the true owner, *nor, indeed, such as to give evidence that the land was in fact designedly inclosed.*[2]

We have cited and relied on *Vineyard* many times. In West Production Co. v. Kahanek, 132 Tex. 153, 121 S.W.2d 328, the owners of the Butte 10,000-acre pasture enclosed the disputed tract and parts of two adjoining tracts with their land.

Later they built an additional fence that excluded the disputed tract and the parts of the two adjoining tracts. The result was the creation of a new enclosure consisting of about 160 acres that included the disputed tract. It was held that the claimant's repair of the fences and use of the land in the enclosure for grazing did not constitute adverse possession.

The evidence in *Kahanek* and *Vineyard* showed that the fences were built by adjoining owners. Here the record is silent as to the purpose for which the fences were originally built. That was the situation in Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781, where we said:

> When the use relied upon to support the statute is grazing, there must be also at the same time sufficient enclosure, *such as to give evidence that the land was designedly enclosed and to show the assertion of claim hostile to the true owner.* Vineyard v. Brundrett [17 Tex. Civ.App. 42], 42 S.W. 232, 235. The ordinary case for the acquisition of title by adverse possession, when the use is grazing, is one in which the person claiming title under the statute has built a fence or fences enclosing the land and has maintained the enclosure and continuously used the land for grazing during the statutory period. Such construction of fences and use of the land for grazing afford evidence of hostile claim. Petitioner would bring this case within that general rule.

We agree, however, with the decision of the Court of Civil Appeals that the facts of this case take it out of that general rule and bring it under the principle announced and applied in the following cases, that when the disputed tract of land has been casually or incidentally enclosed with other land, especially when, as here, such other land is held by the possessor under deed, the incidental enclosure and the occasional grazing of the

---

2. Emphasis throughout this opinion is supplied.

disputed tract by cattle straying from the titled land will not amount to such adverse and hostile possession and use as will support the statute of limitations.

■ Defendants would distinguish the present case on the ground that Weinacht repaired or rebuilt the fences around the 400-acre trap. We do not agree. The claimant in *Kahanek* repaired the fences. The claimant in *Orsborn* maintained the fences in repair and rebuilt parts that were washed out from time to time. Here there is no proof that the fences were originally built for the purpose of enclosing the NW/4 of Section 39, and neither the enclosure itself nor the work done by Weinacht on the fences warrants the conclusion that plaintiffs' land was designedly enclosed. His repair or rebuilding of the fences along the east line of his deeded Section 36 and along the south line of his deeded Section 40 is clearly referable to his deed. They were designed to and did form part of the enclosure of his deeded land, and the fact that they also bounded the trap on the north and west was purely incidental. In these circumstances and in view of Weinacht's lease of the SW/4 from the Goulds, his repair of the fences bounding the trap on the south and east does not evidence an intention to enclose the disputed tract. It was simply the easiest and most economical way of maintaining an enclosure that would permit grazing on the SW/4.[3]

We accept Weinacht's statement that cattle and horses were kept in the trap "all of the time," but he did not attempt to say how many animals were generally kept there. According to Don's undisputed testimony, the average number kept on the entire ranch over the years was ten or twelve brood mares and horses and about 80 to 100 head of cattle. It seems fair to assume, therefore, that relatively few animals regularly grazed in the trap. Be that as it may, the only salt and water provided for them were in the water lot on Weinacht's deeded land. Since plaintiffs' land was never separately enclosed, the animals would naturally move at times from the water lot across the unclaimed land enclosed therewith to the tract in controversy. It was always necessary, however, for them to return to the water lot to obtain water and salt. Weinacht was under no legal obligation to fence off the NW/4 and in the absence of a violation of some statute would have incurred no liability to the record owner simply because his cattle did not stop their grazing when they reached its unfenced south line. We thus have a classic case of incidental enclosure and incidental grazing, and these are insufficient as a matter of law to constitute a visible appropriation of the land.

■ Defendants argue that the cutting of burs and poisonous weeds in the 400-acre trap adds something to their case. There is testimony that the weeds were cut "every year," but no one undertook to say whether this was done more than once a year or how long each operation lasted. Weinacht evidently had the right to cut weeds on the SW/4 he held under the

3. If we understand Weinacht's testimony, the fences bounding his deeded ranch and on the south line of the SW/4 he had under lease were put in substantially better condition than the remainder of the fence on the south line of Section 39 and the fence bounding the trap on the east. As indicated by quotation in the opinion, he "didn't build too good a fence" on the east. The following excerpt from his testimony relates to the fence along the south line of Section 39:

Q And then you fenced from the SW/4 of 39 to the point marked B on this plat which is the SE corner of the SW/4.
A That is a real fence right now.
Q Now, when was that rebuilt as a real fence?
A I rebuilt that as a real fence right after I got the thing.
Q All right. Now, how about then the rest of the part across there?
A I rebuilt that but I didn't build it as good as I did that other.

Goulds, and his keeping the trap free of weeds could hardly be considered an appropriation of the remainder of the land in the enclosure. It is settled, moreover, that the cutting of weeds is "not such use of the property as to meet the requirements of Article 5510 V.A.C.S. for establishing title by adverse possession." City of Dallas v. Etheridge, 152 Tex. 9, 253 S.W.2d 640. This is in accordance with the general majority rule that cutting and gathering a natural crop does not constitute adverse possession. Annotation, 170 A.L.R. 838, 863. Here the cutting of weeds was no less incidental than the grazing of the tract or its inclusion in the enclosure maintained by Weinacht.

Although defendants argue to the contrary, their case is not supported by our decision in Butler v. Hanson, Tex.Sup., 455 S.W.2d 942. There the claimant put new posts between the old posts and added net wire to the fence around his entire ranch. The record did not show by whom the old fence was originally built but, as pointed out in our opinion, the claimant "made it his fence." More importantly, the location of the fences with respect to the disputed tract showed that the claimant's work was done for the purpose of enclosing the land in controversy. The record owner, who also owned the land south of the fence, could not have failed to know that the property in question was designedly enclosed by the adverse claimant.

There are no similar facts here. Defendants' repair of the fences, cutting weeds and permitting their livestock to graze on the disputed tract under the circumstances disclosed by this record did not constitute an actual and visible appropriation of the land as required by Article 5515. In our opinion they failed to carry their burden of showing adverse possession, and the trial court should have sustained plaintiffs' motion for an instructed verdict.

The judgments of the courts below are reversed, and the cause is remanded to the district court with instructions to render judgment for plaintiffs.

POPE, Justice (concurring).

I concur in the result. Mr. Weinacht, during that period of time over which he must assert his ten-year claim, wrote those whom he thought to be the owners for the purpose of obtaining a grass lease on the acreage in dispute. On another occasion, in a conversation about the land with the owners, he failed to disclose to them the fact that he was claiming the tract by adverse possession. These events show that the nature of his claim lacked the elements of hostility and notice which adverse possession compels.

I do not agree that grazing only in a completely enclosed tract can never support a claim of adverse possession where the tract was not enclosed by the claimant. "Mere" grazing, or "occasional" grazing, or "casual" grazing will not provide the necessary notice of the claim. However, active and total use to the limits of a pasture's capacity and to the exclusion of all others, with a claimant's livestock continuously present and visible, will give that notice and support a claim of adverse possession. This is particularly true in the case of land which is suitable for no other purpose.

REAVLEY, Justice (dissenting).

I respectfully suggest that the court has not presented this trial record to the advantage of the party whose contentions have been accepted by the trier of fact. More objectionable to me is the division of the claimant's acts of appropriation of the land between fencing and grazing and weed clearing for separate consideration by which rules of law are applied to nullify the effect of each, even though the combined acts of appropriation justify the finding of visible assertion of ownership.

I agree with the opinion of the court of civil appeals and find evidence in the

record legally sufficient to support the verdict of the jury.

L. A. Weinacht in 1940 purchased and took possession of the several thousand acre Meier ranch, which included Section 36 to the west and Section 40 to the north of the land in dispute. Weinacht regarded the disputed NW/4 of Section 39 as part of the Meier ranch. He understood that it was not included in his deeds; but he immediately began to claim this land, according to his testimony, and used it as he did the remainder of the ranch. In 1940 this NW/4 was fenced together with the SW/4 and a portion of the SE/4 making about 400 acres under the fence indicated in the plat reproduced in the court's opinion. The fencing was changed in 1954 when the west and north fences shown on the plat were taken down to throw the disputed land into the same enclosure as the remainder of the Weinacht ranch.

The jury found, in answer to the customary inquiry, that Weinacht "had and held peaceable and adverse possession" of the land, "cultivating, using or enjoying the same" for a period of ten consecutive years or more prior to January 9, 1964 when this suit was instituted. Using the statutory language (Arts. 5514 and 5515, Vernon's Anno.Tex.Civil Statutes), the court instructed the jury that "peaceable possession" means continuous possession and that "adverse possession" means "an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another."

This court says that Weinacht "guarded his claim carefully," but almost ten years prior to the filing of the suit he removed the fences from E to A and from E to F and then built a new fence from D to B. These modifications were plainly designed to include this disputed land in the Weinacht pasture.

The court says that Weinacht's "kinsman * * * never heard Weinacht or any of his family make claim to any part of the NW/4." This kinsman (whose wife had a brother who married Weinacht's sister) also testified that he supposed Weinacht owned this land and that he regarded the fence from A to D as the East fence of the Weinacht Ranch.

There is evidence which tends to disprove the adverse claim. There is the failure to render this land for taxes, and there is the letter written by Weinacht in 1952. It should be added that in 1958 Weinacht leased the SW/4 from one of the addressees of the 1952 letter and that no connection is suggested between those addressees and the ownership of the disputed NW/4. The weight to be given this evidence was for the jury to determine.

I will briefly summarize the evidence supporting limitation title during the years from 1940 to 1954. The Weinachts testified that when they first took possession of the 400 acres, in addition to rebuilding the fences along the lines described in their deeds (E to F and E to A), they rebuilt the south fence (F to G) as "a real fence" after finding it practically down. The fence on the east (A to D to G) was repaired with new posts and new wire, and a fourth wire was added to it. I can find no justification for the statement by the majority that the fence from A to D included "a strip off the west side of the NE/4" within the 400 acre enclosure. When the witness Don Weinacht stood at the exhibit, he marked x's for the fence slightly off the property line between the NW/4 and the NE/4, but testimony put this fence on that line and all attorneys assumed throughout the trial that the fence was at the boundary.

From 1940 forward these fences matched all Weinacht Ranch fences and were strong four-wire fences with posts 30 feet apart and with three stays between the posts. The Weinacht procedure was to check the ranch fences continuously, which brought them to check each point of the fence at least once every three months.

Under Weinacht testimony cattle and horses were grazed within the 400 acre en-

closure and on the disputed tract at all times from 1940 to 1954. The animals were watered at a water lot adjoining the southwest corner of the 400 acres. An observer would see the water lot as evidence that the 400 acre enclosure was being used as a steady ranch operation; he would hardly conclude that cattle strayed abroad from their habitat in a small water lot. A road or pickup trail went onto the disputed tract from the Weinacht fee land, the road being used by them to work the cattle pastured on the disputed tract.

The Weinachts testified that the disputed land was kept clean of inkweed and cockleburrs during all of these years, which required that the land be chopped by hoe every year. They said that the result of this cleaning could be seen by observing the land.

The majority correctly say that the cutting of weeds is not such use of the land as to meet the requirements of adverse possession, but the statement assumes no other use of the land. When added to continuous grazing of the land, the weed cleaning is significant evidence of visible appropriation. Caver v. Liverman, 143 Tex. 359, 185 S.W.2d 417 (1945); Hoppe v. Sauter, 416 S.W.2d 912 (Tex.Civ.App. 1967, writ ref. n. r. e.).

In Rosborough v. Cook, 108 Tex. 364, 194 S.W. 131 (1917), Chief Justice Phillips said: "The law of limitation of actions for land is founded upon notice. The title by limitation ripens, primarily, only because, in such manner and for such period of time as the different statutes require, notice is given of the hostile claim." The use by the one who occupies land with his instruments or animals must be so open and of such a nature as to notify a watchful owner of its existence and of its hostile character so as to put the owner on inquiry as to the claim of the user. This is the ultimate question with which we are now concerned.

It is the consideration of notice that leads to the rule that unenclosed cattle constitute no evidence of adverse possession. No statute requires that the adverse claimant build a fence around the land he claims, but in a society where unenclosed land is considered open range and commons for the livestock of others, the mere presence of these animals will not be considered as adverse to the ownership of the land. De Las Fuentes v. Macdonell, 85 Tex. 132, 20 S.W. 43 (1892).

The same consideration may be applied to livestock which graze from one tract to another within an enclosure. If the livestock come from an adjoining tract owned by the owner of the animals, their crossing the boundary is not itself notice of a hostile claim. Harmon v. Overton Refining Co., 130 Tex. 365, 109 S.W.2d 457, 110 S. W.2d 555 (1937).

Considerations of notice also lead to the rule that the existence of an enclosure is not itself notice of an adverse claim where the claimant and his livestock have no visible relation to fences bordering the disputed tract. West Production Co. v. Kahanek, 132 Tex. 153, 121 S.W.2d 328 (1938).

The majority quote Vineyard v. Brundrett, 17 Tex.Civ.App. 42, 42 S.W. 232 (1897) wherein it was stated that the enclosure did not give evidence that the land was "designedly inclosed." That was significant to the court in the Vineyard case when it came to consider the effect of the north fence on the issue of adverse possession, but that court did not stop with the north fence. It looked at all of the evidence bearing on visible appropriation and concluded:

"When we take into consideration the extent of the bay shores, the size of the tract, the inclosures of others, and the facts that the fences were made to inclose other lands than those in controversy, and that the defendant did not claim title to all the land within the barriers relied on to form the inclosure, the evidence is clearly insufficient to show a possession to support the bar of five years' limitation."

The statute requires visible appropriation by the adverse claimant. It does not require a "designed" enclosure. We ask the jury in a single issue whether claimant's total use of the land was actual and visible appropriation. We do not ask about the fences and the weed chopping and the cattle in separate issues. All of the circumstances of the case must be considered, and we look to more than the fences, or to any one section of the fence. If an adverse claimant, occupying and using land by grazing cattle thereon, posts the premises by putting his own sign along the fence (no matter how casual or incidental a fence), the sign is surely forceful evidence of visible appropriation. Click v. Collins, 273 S.W.2d 90 (Tex.Civ.App.1954, writ ref. n. r. e.).

When the testimony of the Weinachts is assumed to be true, and when everything done on the land is considered together, the decision in the trial court and the court of civil appeals is warranted. I would uphold that decision.

DENTON, J., joins in this dissent.