**C. Hunter McSHAN, Appellant,**

v.

**Anthony PITTS, Appellee.**

**No. 15637.**

Court of Civil Appeals of Texas, San Antonio.

June 15, 1977.

Rehearing Denied July 13, 1977.

William H. Ervine, Jr., Kerrville, for appellant.

Charlie Strauss, Kerrville, for appellee.

CADENA, Justice.

In this trespass to try title suit plaintiff, C. Hunter, McShan, appeals from a judgment, following a nonjury trial, that he take nothing. The judgment is based on the conclusion that defendant, Anthony Pitts, held title acquired by adverse possession under our ten-year Statute of Limitations, Art. 5510, Tex.Rev.Civ.Stat.Ann. (1958).

The land in question is a tract of approximately .9 of an acre which abuts on the eastern edge of the right-of-way of Harper Road in Kerr County, and is bounded on the north, east, and south by land to which defendant has the record title. Plaintiff owns several acres, title to which is not in dispute here, which lie adjacent to the western edge of the Harper right-of-way. This land is separated from the tract in dispute by the highway. For many years the land in dispute, as well as defendant's land lying north and south of the disputed strip, has been separated from the highway by a

fence, but there is no fence separating the strip in dispute from the land to which defendant has the record title. The parties agree that record title to the .9-acre strip is in plaintiff.

Until approximately 1939, the land on both sides of New Harper Road was owned by E. C. Fisk, including the land on the west side of the road now occupied by plaintiff, the land on the east side of the road to which defendant holds the record title, and the disputed strip. At that time the land on the east side of the highway was separated from the right-of-way by a fence without gates.

Fisk's daughter lived with him in a house on the west side of the highway from about 1920 to 1946. After her father conveyed some of the land on the east side of the highway to a man named Hartman in about 1939, no further use was made by her father of the strip in question. Sometimes she crossed the highway and went wading in the creek. Since there was a fence along the eastern edge of the New Harper Road right-of-way, she walked down the Old Harper Road, which adjoins what is now defendant's property on the north, to the creek. She did not know whether her father, after he conveyed land on the west side of New Harper Road to Hartman in 1939, claimed any land east of such highway.

In 1961 Fisk executed a conveyance to plaintiff's mother, Mrs. McShan. The description in the deed includes the land on the west side of New Harper Road as well as the disputed strip on the east side of that highway. After 1961 plaintiff, who lived in New York at that time, visited his mother, who lived in a house on the land west of the highway, at least once a year. While staying at his mother's house, plaintiff would occasionally cross the highway and go on the land in question. Sometimes, friends from New York would visit him and his mother, and these friends, with their children, would occasionally go on the land across the street. The children would play in the creek and the adults apparently liked the scenery. No other use of the disputed strip was made by plaintiff other than these occasional entries. There is no evidence that Mrs. McShan made any use of the disputed strip.

Mrs. McShan died in mid-1973, leaving plaintiff and his brother, who lives in Houston, as her sole heirs. Plaintiff purchased his brother's interest in the property shortly thereafter and established his residence on the land west of the highway.

In the fall of 1973 plaintiff noticed that the fence on the east side of New Harper Road had been removed. At that time he talked to defendant about the strip in question, informing defendant that he owned the .9-acre tract. Defendant, nevertheless, continued with the work and constructed a deer-proof fence, eight feet high, in place of the old fence which he had removed.

Plaintiff filed this suit on June 20, 1975.

As far as the tract of land east of the highway is concerned, the record contains no evidence of its use between approximately 1939, when Fisk conveyed to Hartman, and 1950, other than the testimony of Fisk's daughter summarized above.

On August 31, 1950, G. C. McCoy conveyed what is now defendant's land to T. A. Black and wife, Eyvonne Black. Mrs. Black testified that at the time they purchased the property it was all enclosed by a fence, including the tract in dispute, with no cross-fences separating the .9-acre tract from the rest of the land east of the highway. The creek often flooded, and they repaired the fencing many times. They knew Mr. Fisk and visited him often, but the question of title to the tract in dispute was never mentioned. They claimed everything within the fence and used the property "just like it was ours." Fisk made no effort to use the tract in question, and they assumed, and claimed, that everything within the fence belonged to them.

On September 25, 1954, the Blacks conveyed to W. T. Tomlin, in whom the title rested until January 20, 1955. Tomlin apparently purchased the land for investment purposes and made no use of it himself. However, L. B. Hough, Jr. testified that his

father leased the land from Tomlin and grazed livestock on it. The property was completely fenced, with no gate in the fence along the New Harper Road. He and his father maintained the "fences." This witness did not know whether the arrangement between his father and Tomlin was evidenced by an instrument in writing or not.

Tomlin conveyed to Walter Helmke and wife, Irma Helmke, on January 20, 1955. Helmke testified that he cleared the land, dammed up the creek, and built a lake. He operated a fish hatchery in the creek and lake and operated a bait stand, in addition to "running" sheep and cattle on the land. He claimed all the land enclosed by the fences, which he maintained. At the time he purchased the land he cleared it, including the tract in dispute, with a bulldozer. He claimed all the land within the fences.

The Helmkes conveyed to Glen Daniel and wife, Gladys, on February 3, 1961. According to Helmke, he claimed all land within the fence and that is what he sold to Daniel. At that time, the Daniels lived in Oregon, but they purchased the land for the purpose of making it their home. They returned to Oregon approximately in March 1961, but Mr. Daniel returned to Kerrville shortly thereafter, with Mrs. Daniel remaining in Oregon to sell the property they owned there. Mr. Daniel was killed in an automobile accident near Kerrville on July 31, 1961. Mrs. Daniel then returned to Texas and began living on the tract she and her husband had purchased. She "ran sheep" on the land. In 1967 she built a new house on the land and, except for an area around the new house where she lived, she leased the remainder of the land to tenants who kept horses and cattle on the land. She kept the dam repaired and always maintained the fences, with the help of neighbors. She married Morris Morgan in 1971, and sold the land to defendant on August 2, 1972.

Morris Morgan, who joined his wife in the execution of the deed to defendant, testified that he learned, shortly before the conveyance to defendant, of a possible "discrepancy on the acreage . . ., as to somebody claiming something." He told defendant there "may be a discrepancy on the Harper Road edge of this," but he told defendant not to worry about it because, "for forty years I know that fence has been there." He told defendant he and his wife would not have the land surveyed, and defendant agreed to purchase the land "as is." He told defendant the "discrepancy" concerned "something about the State paying for this right of way down there."

The trial court's "conclusions of law" include the following: (a) The possessions of Black, Tomlin, Helmke, Daniel, and defendant of the disputed strip "was continuous, exclusive, open, notorious, and obvious and the land was put to such use under a claim of right as to constitute adverse possession." (b) The use made by all adverse claimants "was sufficient to give notice to the record owners of the adverse claim." (c) The "tacking" of the possessions of Black, Tomlin, and Helmke "from 1950 to 1960 was sufficient to mature title by limitations under the ten year statute."

Plaintiff's first point challenges the conclusion that defendant had proved title under the ten-year statute.

■ The form of plaintiff's first point suggests that plaintiff is entitled to recover the land unless defendant succeeds in proving that he has acquired a title superior to plaintiff's record title. This is not true. Since plaintiff was not in possession of the land in question he must, in order to prevail, rely on the strength of his own title. Under these circumstances, proof of a legal title outstanding in a third person constitutes a defense to plaintiff's suit, even though defendant cannot connect himself with such outstanding legal title. 56 Tex. Jur.2d *Trespass to Try Title* § 47, at 152–3 (1964). Therefore, if the court correctly concluded that the title of plaintiff's predecessor was lost under the ten-year statute in 1960 is correct, it necessarily follows that plaintiff has failed to prove a superior title in himself and the judgment that he take nothing by his suit must be affirmed. Whether such limitation title has effective-

ly been acquired by defendant is irrelevant. Defendant did not, by specifically pleading limitations as a defense, waive his plea of "not guilty" and the defenses available to him under such plea. *Mortgage Land & Inv. Co. v. Spears,* 162 S.W.2d 1015, 1016 (Tex.Civ.App.—San Antonio 1942, writ ref'd).

Under his first point, plaintiff presents two contentions concerning the sufficiency of the possession by Black, Tomlin, and Helmke during the period 1950–1960.

First, plaintiff argues that there was a break in the continuity of possession during such ten-year period since Tomlin, who purchased what is now defendant's land in 1954, never lived on it during the period of almost four months intervening between the time he purchased it and the time he conveyed to Helmke on January 20, 1955.

█ The evidence is undisputed that Helmke never lived on the land, since he had purchased it for investment purposes. However, the evidence supports the conclusion that Helmke leased the land to Hough. Since possession by a tenant is considered to be the possession of the landlord for purposes of the statute of limitations, there was no break in the continuity of the possession. 2 Tex.Jur.2d *Adverse Possession* § 66 (1959).

█ Plaintiff's second challenge is directed to the sufficiency of the possession of plaintiff and of all of his predecessors in title to satisfy the requirements of the statute. This challenge is based on the rule, apparently consistently applied in Texas, that an adverse claimant who relies upon grazing only of his adverse use and possession must show as part of his case that the land in dispute was designedly fenced. *Orsborn v. Deep Rock Oil Corp.,* 153 Tex. 281, 267 S.W.2d 781 (1954).

In this case the evidence shows that the fence enclosing defendant's tract and the land in dispute was in existence in 1939 when all of the land on both sides of the highway was owned by Fisk. The fences were there when the Blacks purchased the land in 1950. While the evidence does not disclose the identity of the person who built the fences, it does establish conclusively that none of the persons who claimed the land beginning in 1950 built the fences.

█ As the Supreme Court said in *Orsborn,* 267 S.W.2d at 785:

When the use relied upon to support the statute is grazing, there must be also at the same time sufficient enclosure, such as to give evidence that the land was designedly enclosed and to show the assertion of claim hostile to the true owner. *Vineyard v. Brundrett,* 17 Tex.Civ.App. 147, 42 S.W. 232, 235. The ordinary case for the acquisition of title by adverse possession, when the use is grazing, is one in which the person claiming title under the statute has built a fence or fences enclosing the land and has maintained the enclosure and continuously used the land for grazing during the statutory period. Such construction of fences and use of the land for grazing afford evidence of hostile claim.

The "designedly enclosed" rule was applied by the Supreme Court in *McDonnold v. Weinacht,* 465 S.W.2d 136, 141–42 (1971).

█ In his concurring opinion in *McDonnold,* Justice Pope persuasively argues against a rule which compels the conclusion that "grazing only in a completely enclosed tract can never support a claim of adverse possession where the tract was not enclosed by the claimant." 465 S.W.2d at 144. While agreeing that "mere," "occasional," or "casual" grazing is insufficient, he points out that "active and total use to the limits of a pasture's capacity and to the exclusion of all others, with a claimant's livestock continuously present and visible," will give the required notice of the hostile claim. *Id.* In the case before us there is no evidence of such "active and total use to the limits of a pasture's capacity * * *, with a claimant's livestock continuously present and visible." The evidence in this case does no more than support a conclusion of "occasional" grazing on the disputed strip, and some of that grazing was by deer, as distinguished from cattle or other domesticated

animals. Even under the view expressed in the dissenting opinion of Justice Reavley in *McDonnold,* "in a society where unenclosed land is considered open range and commons for the livestock of others, the mere presence of these animals will not be considered as adverse to the ownership of the land." 465 S.W.2d at 146.

Under the rule applied in *McDonnold* and prior decisions, the use of the disputed strip by defendant and his predecessors in title, including the use by Black, Tomlin, and Helmke from 1950, was not sufficient to support a claim of title by adverse possession.

The judgment of the trial court is reversed and judgment is here rendered in favor of plaintiff for title and possession of the land in dispute.